**UNITED STATES of America**

v.

**Robert C. LEWIS, James E. Boardley, Tommy M. Motlagh, also known as Tommy Motley, Defendants.**

**Crim. A. No. 81–0436.**

United States District Court, District of Columbia.

March 17, 1982.

Stanley S. Harris, U. S. Atty. by Richard I. Beizer, David Stanley, Asst. U. S. Attys., Washington, D. C., for United States of America.

Robert P. Watkins, F. Lane Heard III, Williams & Connolly, Washington, D. C., for defendant Lewis.

Robert W. Mance III, Law Office of R. Kenneth Mundy Associates, P. C., Washington, D. C., for defendant Boardley.

Jacob A. Stein, Robert F. Muse, Stein, Mitchell & Mezines, Washington, D. C., for defendant Motlagh.

## ORDER

CHARLES R. RICHEY, District Judge.

The Court has before it a motion to sever on behalf of defendants Lewis and Boardley,[1] ("defendants") pursuant to Rule 14 of the Federal Rules of Criminal Procedure and the Government's opposition thereto. In their motion, the defendants contend that the jury should not hear the strongly

---

1. Defendant Boardley joined in defendant Lewis' motion at the March 12, 1982 hearing.

(March 12, 1982 Tr. at 11).

incriminatory declarations by defendant Motlagh that are admissible only against him. Specifically, the defendants challenge the testimony of Mr. Nasser Zolfaghari, an aquaintance of defendant Motlagh. During the grand jury proceedings in this case, Mr. Zolfaghari testified that on February 18, 1981, he happened to encounter defendant Motlagh at the Resorts International Hotel in Atlantic City, New Jersey. Mr. Zolfaghari testified that defendant Motlagh was very upset because his "partners" Lewis and Boardley had "messed up" and that he was in a lot of trouble. (Zolfaghari Oct. 14, 1981 Transcript ["Tr."] at 19–21). Mr. Zolfaghari also makes reference through his testimony that the defendant Motlagh could have problems taken care of through Lewis and Boardley because they were partners in the liquor store venture. (Tr. at 7, 11–16).[2]

2. The exact statements that create the *Bruton* problem appear in the Grand Jury testimony of Nasser Zolfaghari of March 11, 1981, and are as follows:

(1)

Q: What was said, as best you can recall?
A: Well, he was my—he is my countryman, and he had a guest. I picked up his dinner tab, and then he came to my table to say thanks, and I had a date. I introduced him to my date, and he told me, "Do you know who are they?" I say no.
Q: When he say "who are they," was he referring to his companions at dinner?
A: His companions, yes.
Q: And you said no, you didn't know who they were?
A: Correct.
Q: These were two black gentlemen; is that right?
A: Yes, sir.
Q: And he asked you if you knew who these people were, right?
A: Right.
Q: You said no?
A: Right.
Q: Did he explain who the gentlemen were?
A: Yes. He said they are from ABC Board in D. C.
Q: Did he say anything further about that?
A: Well, he said, "If you have any difficulty or anything, they solve it for you."
Grand Jury Tr. at 6, 7.

(2)

Q: What were you talking about on that occasion?
A: Oh, he told me which is his partner, they goof off. They make many, many mistake.
Q: No, no, I am talking about the occasion when you talked at Tommy Motlagh's house at dinner. Did he tell you that he was partners with these ABC fellows?
A: Yes, he did. Yes, he did.
Q: Did he tell you what he was partners with them in, what they were partners in?
A: Well, he said they were supposed—even before I knew he wanted to open up the liquor store in D. C.—
Q: In other words, you had talked to him before, and he had told you that he planned to open a liquor store in D. C.; is that right?
A: Correct.

. . . .

Q: And did he tell you that these ABC people were to be his partners in that venture, the liquor store?
A: Yes. They were supposed to, all three of them, be partner.
Grand Jury Tr. at 11–12.

(3)

Q: Did he have other conversations with you about this same subject, that is, his desire to open up a liquor store in the District of Columbia, and that these two ABC officials that you had seen him in the company of were going to be his partners in this venture?
A: Yes, he did.
Q: And did he likewise say to you again that if you have any ABC problems, he is friendly with these guys; they are his partners; they can help you out, as well?
A: Yes, he did.
Q: Did he mention whether or not they had ever helped out anybody else?
A: He said he helped Roshan, you know, in that matter.
Grand Jury Tr. at 13.

(4)

Q: We are going to get to that in a minute. Now, on several of those occasions when he spoke to you about his desire to open a liquor store, to sell lottery tickets from the liquor store, he did mention to you that he was going to be partners with these fellows from the ABC Board that you had seen him out to dinner with; is that right?
A: Yes, sir.
Grand Jury Tr. at 15.

(5)

Q: So is it fair to say, Mr. Zolfaghari, that on more than one occasion Mr. Motlagh mentioned to you that he was planning to open a liquor store, and that he was going to be partners with these fellows from the ABC Board that you had seen him with?
A: Yes, sir.
Grand Jury Tr. at 16.

(6)

Q: What was his appearance at that time? Did he appear to be calm, or did he appear to be upset?
A: He was very upset. He was scary and he was worried, and he told me which his partner, they goof off.

While it is clear that these hearsay statements are admissible against the defendant Motlagh, the defendants Lewis and Boardley contend that severance is mandated for to admit such statements would violate their Sixth Amendment rights, as this case falls squarely within the rule articulated by the Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *In Bruton*:

> A joint trial of petitioner and one Evans in the District Court for the Eastern District of Missouri resulted in the conviction of both by a jury on a federal charge of armed postal robbery, 18 U.S.C. § 2114. A postal inspector testified that Evans orally confessed to him that Evans and petitioner committed the armed robbery. The postal inspector obtained the oral confession, and another in which Evans admitted he had an accomplice whom he would not name, in the course of two interrogations of Evans at the city jail in St. Louis, Missouri, where Evans was held in custody on state criminal charges.

391 U.S. at 124, 88 S.Ct. at 1621.

The petitioner was convicted, which was affirmed on appeal, despite the fact that "the trial judge instructed the jury that although Evans' confession was competent evidence against Evans it was inadmissible hearsay against petitioner and therefore had to be disregarded in determining petitioner's guilt or innocence. *Id.* at 125, 88 S.Ct. at 1622. The Supreme Court reversed, holding that the petitioner was substantially prejudiced by the admission of the statement, despite the trial judge's instruction to the jury to disregard the statement as to the petitioner. Additionally, the Court held that the use of Evans' confession violated the petitioner's right of cross-examination as secured by the Sixth Amendment. As the Supreme Court indicated:

> We still adhere to the rule that an accused is entitled to confrontation of the

Q: He said his partners goofed off; is that right?
A: Right.
Q: And his partners, did he identify who his partners were?
A: Yeah, the gentlemen I saw before with him from the ABC Board of District of Columbia
Q: Did he mention them by name?
A: Mostly always we were talking, you know, because the face I saw before, okay, and I was licensed in D.C. He was licensed in D.C., too, and it was part of the thing between—which is the name, it was not necessary he bring the names up, okay? Always we were talking, when we were talking about those gentlemen, we just mentioned, we say "ABC people."
Q: So basically he said the ABC guys messed up?
A: Right.
Q: Is that right?
A: Yes, sir.
Q: Did he say anything further about how they had messed up?
A: Well, before that time, maybe over five or ten times, you know, he was telling me he open up the liquor store. These things I never ever believed him until that night, and that night he told me, which is his partner, they goof off. They went to rent a place from Hechinger's, and they forced them, you know—I mean his partner, they forced the Hechinger's Mall or manager—I don't know who—to just—they don't give them an occupancy permit or they make some difficulty for them, which is when they told—I think when they reject them, which is they do not rent it to them, these people, they put them under pressure, which is they made some kind of difficulty for them. I don't remember, you know.
Q: Let me see if I understand what you said. Mr. Motlagh said to you that his partners, these ABC guys, messed up somehow.
A: Right.
Q: And how they messed up was that they put pressure on someone at Hechinger's.
A: Correct.
Q: Or the people who were in charge of leasing space, threatening these people about occupancy permits and licenses and things of that nature; is that right?
A: Right.
Q: And that obviously Hechinger's person or persons had resisted that pressure?
A: That's right. Tommy said they called the police, right.
Q: Tommy said they called the police?
A: Tommy said that Hechinger's Mall, from Hechinger's Mall they called the police, and they put them in the—he told me, which is, "You're going to see it in the paper tomorrow." It was not on the paper. I don't know; maybe it was. That's the way he told me, okay. He said, "You're going to seen it in the paper tomorrow." I don't know about the date of the paper. You can check it out.

Grand Jury Tr. at 19–21.

witnesses against him and the right to cross-examine them.... We destroy the age-old rule which in the past has been regarded as a fundamental principle of our jurisprudence by a legalistic formula, required of the judge that the jury may not consider any admission against any party who did not join in them. We secure greater speed, economy and convenience in the administration of the law at the price of fundamental principles of constitutional liberty. That price is too high.

*Id.* at 134–35, 88 S.Ct. at 1626–27.

The same situation exists in the present case. The Government further contends that whatever impact these statements may have on the defendant Motlagh, the statements are not "powerfully incriminating" against either defendant Lewis or Boardley. The Government contends that by competent evidence, both defendants Lewis and Boardley have already incriminated themselves. (Gov't March 12, 1982 Opp. at 3.) At the March 12, 1982 hearing, the Government attempted to distinguish the difference between the present case and *Bruton*, wherein the Government stated:

> In our papers, we made a review, not a thorough one—perhaps the lateness of the hour prohibited us in some respect on that—but we tried to make a thorough review of just some of the highlights of the evidence against Mr. Lewis, and we summarized that.
>
> Similarly, Your Honor, against Mr. Boardley there are—suffice it to say Your Honor has listened to the tapes— just on the tapes alone, there are powerfully incriminating statements of Mr. Boardley that are competent evidence to be introduced before the jury. Likewise, there are powerfully incriminating statements of Mr. Lewis that will be introduced before the jury as competent evidence.
>
> There are also, Your Honor, as we have tried to point out with respect to Mr. Lewis, certain actions he took, and there are likewise actions that Mr. Boardley took, with respect to obtaining the ABC license for Mr. Briggs, who is charged in the indictment, with respect to scheduling hearings, with respect to a number of different things, that incriminate, that inculpate, Mr. Boardley on the one hand and Mr. Lewis on the other that put them together in the partnership.
>
> Indeed, these facts, in and of themselves, we think, distinguish this case entirely from Bruton where there was no such other competent evidence that was going against Bruton.

March 12, 1982 Tr. at 14–15.

On its face, it appears as if the Government seeks to have this Court make a preliminary determination of guilt based on the evidence presently before it. Yet, the Government itself readily admits that such a determination rests solely in the hands of the twelve jurors. (Tr. at 12.) Moreover, Mr. Lewis readily admits that the tapes present a problem, yet is prepared to deal with it wherein his counsel, Mr. Watkins, states:

> The fact that Lewis has made those statements is something that we can deal with. Mr. Lewis welcomes the opportunity to take the stand in front of a jury and defend or explain or do whatever he has to do with those statements. And we will do that at trial, I say that to you right here.

Tr. at 24.

Mr. Watkins reiterated his position later in the proceedings wherein he stated:

> Your Honor, I hate to belabor this but there is just one thing that I would like to respond to Mr. Beizer said, referring to my client, "They cannot deal with the statements that come out of their own mouths," talking about the statements on the tape recording.
>
> Your Honor, I contend that we can, and I am willing to do that at trial but I am not willing, and I do not think I am required to, to deal with the statements that come out of Motlagh's mouth that are not admissible against my client, and that is what Bruton is about.

That is why I say, Your Honor, we have to have a severance.

Tr. 35–36.

The Court is thus faced with a problem of: What if the defendants Lewis and Boardley are successful in their defense without the statements in question? If the statements are admitted at the trial and the defendants are convicted, the Court will never know if the convictions are the result of the hearsay statements. This Court, as the Supreme Court did in *Bruton*, finds the price is too high to admit the statements in question where the defendants are denied the right to cross-examine the defendant Motlagh.[3]

Accordingly, the statements in question will not be admitted against either defendant Lewis or defendant Boardley.

■ The Court is now faced with the problem of how to proceed with the mode of trial in this complex criminal matter.

Preliminarily, the Court rejects the Government's contention that appropriate limiting instructions will properly restrict the jury's use of Zolfaghari's testimony to the defendant Motlagh alone. (Gov't Opp. at 5–6). The Court of Appeals for this Circuit in *Sims v. United States*, 405 F.2d 1381, 1382–3 (D.C.Cir.1968) articulated the dangers of such prejudicial joinder wherein it held that "*Bruton v. United States* clearly shows the hollowness of such cautionary instructions and illuminates the charade of pretending that the jury can put out of its mind damaging evidence it has just heard. . . ." The Court finds this approach especially appropriate where the Government admits that all of Mr. Zolfaghari's

statements, including the pre-February 18–19, 1981 admissions and the February 18–19, 1981 admissions themselves are inadmissible against defendants Lewis and Boardley. (Gov't Opp. at 1).

Though the Court has determined that the statements in question cannot be admitted against the defendants Lewis and Boardley, the Court will not sever the defendant Motlagh for a separate trial.[4] Thus in order to hold a joint trial, while preventing the statements in question to be admitted against defendants Lewis and Boardley, the Court will empanel two juries. The first jury will be empaneled to hear the case against defendants Lewis and Boardley. The second jury will be empaneled to hear the case against defendant Motlagh. Though this is an innovative technique, the Court finds the use of the two juries to be the best way to expedite this case consistent with the ends of justice.

As this Court set out at the March 15, 1982 status call, the procedure to be implemented at this trial will be as follows:

1. The defendants Lewis and Boardley will select a jury of twelve persons with five alternates on March 17, 1982. The defendants will have thirteen peremptory challenges for the twelve-person jury and the Government will have six. There will only be three peremptory challenges combined for the 5 alternates.

2. The defendant Motlagh will then select a jury of twelve persons with five alternates on the same date. The defendant Motlagh shall have ten peremptory challenges and the Government six. Again, both sides will share three peremptory challenges against the five alternates.

---

**3.** The defendant Motlagh has reiterated this position through Mr. Stein, that he will not take the stand. (Def. Motion for Severance, Exhibit 1).

**4.** This is consistent with this Circuit's opinion in *United States v. Leonard*, 494 F.2d 955, 965 (D.C.Cir.1974); where the Court held:

This reflects the strong federal policy favoring joinder because it
expedites the administration of justice, reduces the congestion of the trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time

and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.

*United States v. Leonard, supra, quoting United States v. Hines*, 455 F.2d 1317, 1334, *cert. denied*, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). A "joint" trial is especially mandated in this case where the parties have intimated that the trial will last approximately four to six weeks. If separate trials were held, the court would be faced with over two months of trial time.

3. Once both juries have been selected, they will be dismissed until Thursday morning, March 18, 1982, at which time the juries will be sworn in. The remainder of March 17, 1982, will be devoted to the remaining outstanding motions.