UNITED STATES of America

v.

Robert C. LEWIS, Appellant.

UNITED STATES of America

v.

Tommy M. MOTLAGH, Appellant.

UNITED STATES of America

v.

James BOARDLEY, Appellant.

**Nos. 82–1703, 82–1713 and 82–1732.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1983.

Decided Aug. 19, 1983.

As Amended Aug. 24 and 25, 1983.

Certiorari Denied Nov. 28, 1983.
See 104 S.Ct. 492.

Robert P. Watkins, Washington, D.C., with whom F. Lane Heard, III, Washington, D.C., was on brief, for appellant in No. 82–1703.

Robert F. Muse, Washington, D.C., with whom Jacob A. Stein, Washington, D.C., was on brief, for appellant in No. 82–1713.

R. Kenneth Mundy, Washington, D.C., was on the brief for appellant in No. 82–1732. James E. Boardley entered an appearance pro se in No. 82–1732.

Joseph Michael Hannon, Jr., Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Michael W. Farrell, Richard L. Beizer, and David W. Stanley, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee. John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, entered an appearance for appellee.

Before ROBINSON, Chief Judge, and WRIGHT and SCALIA, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

This case involves appeals from convictions rendered after jury trials. Appellants Robert C. Lewis and James E. Boardley were found guilty of conspiring to commit bribery, 18 U.S.C. § 371, and of soliciting bribery, 18 U.S.C. § 201(c). Appellant Tommy Motlagh was found guilty of conspiring to defraud the District of Columbia, 22 D.C.Code § 105a(a). Among the arguments appellants pose challenging their convictions is their assertion that the trial court committed reversible error by trying their severed cases simultaneously before two juries.

We have considered and rejected all of the appellants' arguments and affirm their convictions.

### I. FACTUAL BACKGROUND

The offenses giving rise to this case occurred between December 1979 and February 1981. During that period appellant Lewis was the Director of the District of Columbia Department of Licenses, Investigations, and Inspections and the Chairman of the District of Columbia Alcoholic Beverage Control Board (ABC). Appellant Boardley was Staff Director of the ABC, having been appointed to that position by Lewis. Appellant Motlagh owned a restaurant-bar in the District.

Lewis and Boardley used their official positions in an attempt to pressure Hechinger Mall, a large shopping center then under construction, into providing Motlagh with a lease for a liquor store. To obtain the assistance of Lewis and Boardley, Motlagh agreed to provide them with a secret interest in the profits of the liquor store. What unravelled this scheme was the probity of Daniel Russell, the Hechinger official Lewis and Boardley relied upon to obtain a lease for the liquor store. Russell revealed their plan to federal agents and aided these agents in prosecuting the appellants.

Lewis and Boardley first approached Russell in December 1980 after they had urged other officials of the Hechinger Mall to

provide their friend Tommy Motlagh with a lease for a liquor store. Lewis and Boardley told Russell that Motlagh should have the opportunity to purchase the lease because he was a "minority businessman." In response, the Hechinger Mall interrupted negotiations with a white businessman with whom it had discussed leasing arrangements for a liquor store and made plans to begin negotiations with Motlagh. When Russell met Motlagh, however, he discovered that Motlagh was not a black "minority" as he had been led to believe, but rather an Iranian.

After that meeting, Russell told his colleagues at Hechinger's to renew negotiations with the white businessman since Motlagh was not a minority investor. The next time he spoke with Boardley, Russell told him that Hechinger's felt a moral commitment to continue negotiations with the original applicant for the liquor store lease. Boardley then warned Russell that this prospective tenant would have difficulty receiving ABC Board approval. Boardley also told Russell that his friend Robert Lewis, as Director of the Department of Inspections, Investigations, and Licenses, was responsible for the issuance of all the construction permits that were required to complete Hechinger Mall. Finally Boardley offered Russell an interest in the liquor store if he obtained a lease for it from Hechinger's.

Russell informed his superiors at Hechinger's of his conversation with Boardley. They decided to take this information to federal prosecutors. The prosecutors prevailed upon Russell to pretend to go along with Boardley's scheme. The prosecutors also arranged for an FBI agent to serve as Russell's front man in his subsequent negotiations with Boardley and Lewis. The FBI agent posed as "Wade McKeever."

Over the course of a year, Russell and Wade McKeever met with Boardley and Lewis several times and spoke with them often on the phone. Many of these interactions were tape-recorded. Occasionally, Russell or McKeever also spoke on the phone with Motlagh. These conversations, too, were recorded. What these recordings revealed was the making of plans whereby Russell, Lewis and Boardley would each receive secret interests in the Hechinger Mall liquor store that would be owned by Tommy Motlagh. Russell would receive a secret interest in return for obtaining a lease for the liquor store from Hechinger's. Lewis and Boardley would receive an interest in the profits in return for obtaining Russell's assistance and for securing a liquor license for Motlagh. At the same time that Lewis was putting pressure on Russell to provide Motlagh with a lease in the Hechinger Mall, he was also using his public position to arrange for Motlagh to buy a Class A retail liquor license at a greatly reduced price.

On November 9, 1981, a grand jury issued a multi-count indictment against the appellants. Count 1 charged all three with conspiring to commit bribery, 18 U.S.C. § 371. Count 2 charged Motlagh with offering a bribe to Lewis and Boardley, 18 U.S.C. § 201(b). Count 3 charged Lewis and Boardley with soliciting a bribe from Motlagh, 18 U.S.C. § 201(c). Count 4 charged Lewis and Boardley with soliciting a bribe from Hechinger Mall, 18 U.S.C. § 201(c). Count 5 charged Motlagh with conspiring to defraud the District of Columbia of the faithful services of Lewis and Boardley, 22 D.C.Code § 105a(a).

After an eight-day trial, Lewis and Boardley were convicted under Counts 1 and 4; Motlagh was convicted under Count 5. Lewis and Boardley were each sentenced to one to four years' imprisonment on each count, with all but 180 days suspended in favor of probation on the condition that each pay a $5,000 fine on each count. Motlagh was sentenced to one to four years' imprisonment, with all but 180 days suspended, and was placed on probation on the condition that he perform one hundred hours of community service and pay a fine of $5,000.

## II.  ISSUES

### A.  *The Dual Jury Procedure*

The central issue of these appeals is whether the appellants are entitled to re-

versals of their convictions based upon the district court's decision to try their cases simultaneously before two juries. The issue arose because the prosecution sought to introduce the testimony of Nasser Zolfaghari, a former friend of Motlagh's. Zolfaghari's testimony consisted of two sets of statements. First, Zolfaghari stated that on two occasions he had observed the three appellants together at restaurants. Second, Zolfaghari stated that Motlagh had told him that Lewis and Boardley were secret partners in the liquor store and that they had "messed up" in their transaction with Russell. Admitting the first statement into evidence posed no difficulty. But with respect to the second statement, the district court ruled that while it could be admitted into evidence against Motlagh, it could not be admitted into evidence against Motlagh's co-defendants Lewis and Boardley. The testimony could not be admitted against them because under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), admissions of a defendant which inculpate his co-defendant are inadmissible against that co-defendant.

The district court refused, however, to sever the defendants and try them severally. Instead, the court determined that it would hold a joint trial before two juries. One jury would hear the case against Lewis and Boardley. That jury would be prevented from hearing Zolfaghari's testimony concerning Motlagh's statements about Lewis and Boardley. A second jury would hear the case against Motlagh including all of Zolfaghari's testimony. *See United States v. Lewis,* 537 F.Supp. 151 (D.D.C.1982). The district court recognized that this dual jury procedure represented "an innovative technique," but found the use of it "to be the best way to expedite this case consistent with the ends of justice." *Id.* at 155. Counsel for the prosecution as well as for the defense initially objected to the dual jury and petitioned the court to reconsider its plan. These petitions, however, were rejected. Now appellants renew their objection to the dual jury procedure and assert that it robbed them of a fair trial.

The acceptability of dual juries has not been tested in this circuit. Three other circuits, however, have upheld convictions rendered by dual juries at joint trials. *See United States v. Hayes,* 676 F.2d 1359 (11th Cir.1982); *United States v. Rimar,* 558 F.2d 1271 (6th Cir.1977), ·*cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); *United States v. Sidman,* 470 F.2d 1158 (9th Cir.1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973). State courts have generally been more critical of the dual jury procedure than have their federal counterparts. *See, e.g., State v. Corsi,* 86 N.J. 172, 430 A.2d 210 (1981) (the multiple jury procedure "can involve substantial risks of prejudice to a defendant's right to a fair trial. * * * [T]here are too many opportunities for reversible error to take place. We do not recommend it. If it is to be used at all, it should be used in relatively uncomplicated situations"); *Scarborough v. State,* 50 Md.App. 276, 437 A.2d 672 (1981) "The multiple jury system * * * is precarious because all the risks inherent in the traditional jury system become twofold; as a result, courts which have sanctioned its use have done so hesitantly."). But neither a state appellate court nor any federal court of appeals has yet reversed a conviction based upon the use of dual juries. In every case courts have inquired as to whether the appellant could point to evidence indicating specific prejudice to his defense stemming from the dual jury procedure. In the absence of such evidence, courts have let stand the convictions of dual juries.

We follow the lead taken by our sister circuits while acknowledging the warnings eloquently voiced by various state courts. We accept the dual jury procedure so long as it comports with the ethos of due process commanded by our stringent rules of criminal justice. In evaluating the application of the dual jury procedure in particular cases our focus too is upon whether there exists evidence indicating that the dual jury caused specific prejudice to someone's defense at trial.

**20**

■ Appellants attack the district court's decision to use a dual jury in this case. They deride the procedure as "novel," note that it has been criticized by some courts, emphasize that initially the procedure was strongly opposed by the prosecution as well as the defense and assert that using the dual jury was especially ill-advised here because of the complicated nature of the underlying charges. These objections betray a misunderstanding of this court's task. This court's task is not to determine whether the district court made the optimal decision on the eve of trial when it decided to impanel two juries rather than accept the added drain on judicial resources that severing the defendant's cases would have entailed. Rather this court's task is to determine whether the procedure imposed by the district court comports with the basic norm of due process. The basic fairness of the dual jury procedure can only be properly evaluated in light of the trial itself by determining whether any evidence indicates that the procedure specifically prejudiced a litigant's defense.

Neither Boardley nor Motlagh even attempt to show that they suffered specific prejudice on account of the dual jury procedure. Boardley identifies the asserted harm to which he objects in only general terms: "The forms of the verdicts returned by the two juries are the best testament of the problems that result from dual juries." Brief for appellant Boardley at 10. Appellant Motlagh concedes that he is unable to produce evidence indicating specific prejudice resulting from the dual jury. He complains, however, that "[i]t is virtually impossible to identify any specific prejudice because the prejudice is to be found in the subjective response of the jury." Brief for appellant Motlagh at 44. Motlagh contends that the fact that one jury was sequestered while one was not heightened the risk that the juries would be affected in a manner unfairly detrimental to his defense. "Who can now say," he asks, "that the unsequestered jurors were not speculating on this unusual circumstance where jurors on the other side of the room were being escorted in and out of the room by a marshall?" *Id.*

Such idle speculation, however, is not enough to overturn a jury's verdict; as noted above, such extraordinary relief requires evidence of specific prejudice. Furthermore, the district court's sequestration of one of the juries is more indicative of fairness than prejudice. Upon appellant Lewis's motion, the court sequestered the Lewis-Boardley jury in order to lessen the possibility that its members would inadvertently hear about the additional testimony being heard by the Motlagh jury. Complying with Motlagh's request, the district court did not require the sequestration of the Motlagh jury.

Only appellant Lewis attempts to show that his defense was specifically prejudiced by the dual jury procedure. According to Lewis, the prejudice stems from the fact that the Lewis-Boardley jury was not allowed to hear a part of the cross-examination of Zolfaghari by counsel for Motlagh—cross examination that challenged Zolfaghari's credibility—nor the testimony of severed witnesses whose testimony impugned Zolfaghari's honesty. The Lewis-Boardley and Motlagh juries were both exposed to Zolfaghari's testimony that he had seen Lewis, Boardley and Motlagh together in restaurants on two occasions. Counsel for Lewis and Boardley were given an opportunity to cross-examine Zolfaghari with respect to this testimony. They declined. Following a recess, only the Motlagh jury was allowed to hear Zolfaghari's testimony regarding what Motlagh had said to him about Lewis and Boardley. Similarly, only the Motlagh jury was allowed to hear Motlagh's counsel cross-examine Zolfaghari and the witnesses Motlagh's counsel put on the stand to impugn Zolfaghari's testimony. Lewis claims that he was prejudiced in that the jury considering his guilt or innocence was barred from hearing testimony that undermined Zolfaghari's credibility. More specifically, Lewis claims that a discrepancy exists between his testimony and that of Zolfaghari. Zolfaghari placed Lewis and Motlagh together at a period two months before Lewis testified to meeting Motlagh for the first time. Lewis now claims that this discrepancy was significant and that

the dual jury procedure, intended to insulate the Lewis-Boardley jury from inadmissible evidence, had the effect of barring the jury from evidence that would have shed light upon the proper evaluation of this discrepancy.

Appellant Lewis's claim that the dual jury procedure caused him specific prejudice warranting this court's nullification of his conviction is unavailing. First, before Zolfaghari was scheduled to testify for the government the trial court asked counsel how they wished to handle the difficulty that would be caused by his testimony. Appellant Lewis makes no mention of any objection he had at that time regarding the procedure used to present Zolfaghari's testimony to the two juries. Second, appellant Lewis now contends that Zolfaghari's credibility was a central issue in the case. Yet at trial Lewis declined even to cross-examine him. Third, appellant Lewis has presented no persuasive reason why, during the presentation of his defense, he did not call before the Lewis-Boardley jury the witnesses that impugned Zolfaghari's honesty before the Motlagh jury. Finally, even if it were true that an error had been committed in preventing the Lewis-Boardley jury from hearing the testimony against Zolfaghari, appellant Lewis's argument that the effect of this error constituted significant prejudice is wholly lacking in credibility given the factual background of this case.

## B.   The Count 1 Conviction

Appellants Lewis and Boardley challenge their conviction under Count 1, conspiring to commit bribery, contending (1) that their conviction under Count 1 is impermissibly inconsistent with their acquittal under Count 5, conspiring to defraud the District of Columbia, and (2) that their conviction under Count 1 is impermissibly inconsistent with their co-defendant Motlagh's acquittal under that count. These challenges need not long detain us.

■ First, with respect to the asserted inconsistency between conviction on Count 1 and acquittal on Count 5, case law establishes that inconsistency in jury verdicts on multiple counts in a single indictment is not sufficient to overturn an otherwise valid conviction. *See, e.g., Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1973); *United States v. Fox,* 433 F.2d 1235, 1238 (D.C.Cir.1970) ("[H]owever much the jury's conclusion may tax the legally trained penchant for consistency, the law is clear that inconsistent verdicts among the varied charges of a multi-count indictment are not self-vitiating."). Second, it is clear that Motlagh's acquittal on Count 1 alongside Lewis's and Boardley's convictions creates no real inconsistency since Motlagh was not an essential party to the bribery conspiracy. The juries could permissibly have found that Lewis and Boardley conspired only between themselves to solicit a bribe from Motlagh. Hence, the mere fact that the Motlagh jury acquitted Motlagh of culpability in no way undermines the verdict that the Lewis and Boardley jury rendered against those two appellants.

## C.   The Count 4 Conviction

Appellants Lewis and Boardley challenge their conviction under Count 4, asserting that that portion of the indictment fails to state an offense. Count 4 charged Lewis and Boardley with violating 18 U.S.C. § 201(c). More specifically, Count 4 alleged that the appellants, as public officials, solicited from Hechinger's something of value for themselves and Tommy Motlagh—i.e., a lease at the Hechinger Mall—in return for using their official positions to transfer a liquor license to be owned by Motlagh to a location in the Hechinger Mall. According to Lewis and Boardley, Count 4 fails to state an offense because it does not describe the explicit *quid pro quo* that Section 201(c) requires. Appellants maintain that while Count 4 alleges that they solicited a benefit—a lease for a store in which they had a secret interest—Count 4 fails to allege that Hechinger Mall was to receive anything of value in return. Without such reciprocity of benefit, appellants contend that Count 4 fails to state a violation of Section 201(c).

■ This argument is without merit even if we accept the proposition (foreign to contract law) that a bargained-for benefit

to a third party is not a *"quid pro quo"* to the person who seeks it. Assuming, *arguendo,* the validity of appellants' construction of Section 201(c), it is clear that, contrary to their assertions, Count 4 does describe a *quid pro quo* between Lewis and Boardley on the one hand and the Hechinger Mall on the other. Appellants claim that Count 4 alleges in return for their corrupt actions that a benefit was to be conferred not on Hechinger's but only upon Tommy Motlagh. Count 4 of the indictment reads, however, that Lewis and Boardley did "ask, demand, solicit and seek from Hechinger's something of value for themselves, Tommy M. Motlagh, and a corporation to be formed by him ... in return for being influenced in the performance of official acts in connection with the approval [and] the transfer of a liquor license to Tommy M. Motlagh *and the transfer of such license to a location in the Hechinger Mall.*" (Emphasis added.) While Motlagh is the beneficiary most saliently outlined by Count 4, it also described Hechinger's as a vicarious beneficiary of appellant's corrupt scheme inasmuch as Count 4 states that Lewis and Boardley were to effect the transfer of a liquor license to a location in the Hechinger Mall. Plainly such a transfer would inure to Hechinger's benefit if for no other reason than that it would enhance the profitability of one of Hechinger's tenants and engender whatever other benefits liquor stores bring to shopping malls.

### D. *The Count 5 Conviction*

Appellant Motlagh challenges his conviction under Count 5, conspiring to defraud the District of Columbia of the faithful services of its officials. He claims that his conviction is invalid: (1) on the basis of its inconsistency with his co-defendants' acquittal; (2) because Count 5 fails to state an offense; and (3) because Count 5 is multiplicious with respect to Count 1. These arguments are unpersuasive.

First, Motlagh argues that the trial court erred in failing to enter judgment of acquittal where Motlagh was the only defendant convicted of the D.C. conspiracy charge and the alleged co-conspirators were acquitted. The traditional rule is that the conviction of a defendant in a conspiracy prosecution must be vacated if all other alleged conspirators are acquitted in a joint trial. Motlagh contends that the District Court was thus obligated to void his conviction since he was convicted at a joint trial with his co-defendants while Lewis and Boardley were acquitted.

The difficulty with that argument is that this case does not fit within the traditional rule. Although Motlagh was convicted in a joint trial, he was convicted by a jury separate from that which acquitted his co-defendants. The cases he cites which illustrate the traditional rule are cases in which a *single* jury heard the *same* evidence. In these cases either the jury acquitted all but one co-conspirator or the court on appeal reversed the convictions of all but one co-conspirator. Because a person cannot conspire with only himself, appeals courts in such cases voided the conviction of the remaining co-conspirator as irrational. In this case, however, Motlagh and his co-defendants were tried by *different* juries which heard *different* evidence with respect to each set of defendants. In these circumstances, as the Government argues, "[t]he fact that a different jury—hearing less evidence, evaluating the common evidence from a different perspective, and perhaps acting on sympathy, caprice or compromise—did not find Lewis and Boardley guilty * * * should not entitle Motlagh to escape from a valid conviction." Brief for appellee at 71.

Second, Motlagh argues that his conviction is erroneous because Count 5 does not state an offense. Count 5 charged Motlagh (along with Lewis and Boardley) with conspiring to defraud the District of Columbia of its lawful governmental functions including its right to have the disinterested official services of Lewis and Boardley, and its right to have its business conducted honestly. Motlagh contends that 22 D.C.Code § 105a(a), under which he was charged in Count 5, should be limited to fraud on the government involving money or property and not be read to reach fraud which impairs governmental functions. Appellant's contention, if adopted, would mean that Count 5 does not state an offense since it

only alleges conspiracy with respect to fraud involving governmental functions.

To support his interpretation of Sections 105a(a), Motlagh asserts that that section is based on the New York Penal Code which is limited to fraud involving money or property. This assertion, however, is incorrect. The only part of the D.C. law that is based upon the New York Code is that part pertaining to venue and jurisdiction of a conspiracy. Congress needed to borrow this portion of the New York law because of the necessity of greater specificity in a statute applicable to a geographically limited area within the United States. The substantive portion of the D.C.Code provision is modeled after its federal counterpart, 18 U.S.C. § 371. Though the legislative history does not expressly indicate Congress's desire to model the D.C. provision after the federal provision, the similarity of language and the routine construction of D.C.'s local statutes in accord with their federal counterparts lend strong support to the view that the D.C. provision should be interpreted along the lines of the federal provision. It is well settled with respect to the federal provision that conspiracy to defraud encompasses both schemes to cheat the government out of money *and* schemes to obstruct lawful governmental functions. *See, e.g., Dennis v. United States,* 384 U.S. 855, 859–864, 86 S.Ct. 1840, 1843–1846, 16 L.Ed.2d 973 (1966); *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

Finally, Motlagh contends that Count 5 is void because it is multiplicious with respect to Count 1. But it is established that the government may simultaneously charge in one indictment, under similar federal and D.C. statutes, separate offenses that arise out of a single transaction. The only prohibition is that the defendant not be convicted and sentenced under both statutes. *See, e.g., United States v. Shepard,* 515 F.2d 1324, 1333–1336 (D.C. Cir.1975). Here Motlagh has been convicted and sentenced on only one count.

### CONCLUSION

Despite microscopic examination of the trial below by appellants' attorneys, no re-versible error has been discovered. The central question raised by the district court's handling of the case stemmed from its decision to impanel two juries. Notwithstanding the attempt of appellant Lewis to show that the dual jury procedure specifically prejudiced his defense, the main complaint against the dual jury was its novelty. As appellant Motlagh stated, "Any major departure from the traditional trial procedure runs the risk of injecting confusion and uncertainty into the proceedings." Brief for appellant Motlagh at 44. That the dual jury procedure increases these risks is beyond dispute. We do not believe, however, that the spectre of such risks should deter courts from implementing innovative, resource-saving procedures in carefully selected cases so long as these procedures are administered carefully and meet the requirements of due process. In this case these standards were met. We therefore affirm the convictions rendered below.