**UNITED STATES of America**

v.

**Oliver L. NORTH.**

**Crim. No. 88–0080–02.**

United States District Court,
District of Columbia.

Nov. 29, 1988.

---

ORDER

GESELL, District Judge.

Re: *Defendant North's Motion (#39) to Dismiss Counts 1–3, Strike References to the Boland Amendments, and/or Preclude Evidence Concerning the Boland Amendments.*

*Defendant North's Motion (#40), to Dismiss Counts 1–3 Under the Political Question Doctrine.*

*Defendant North's Motion (#41) to Dismiss Count 1, Strike References to Executive Order 12333 and National Security Decision Directive 159, and/or Preclude Evidence Concerning Those Provisions.*

*Defendant North's Motion (#42) to Dismiss Count 1 for Lack of Fair Notice.*

*Defendant North's Motion (#44) to Dismiss Count 1 for Charging Multiple Conspiracies.*

*Defendant North's Motions (#45, #46) to Dismiss Counts 2, 3 for Failure to State an Offense.*

*Defendant North's Motion (#49) to Dismiss Counts 1–3, 4–7, 9 and 23 as Based on Novel Legal Theories Beyond the IC's Authority.*

After considering the briefs and full oral argument of these motions to dismiss counts One, Two and Three, motions 39, 40, 41, 42, 44, 45 and 49 are denied and motion 46 seeking dismissal of Count 3 is granted, for reasons set forth in summary below.

*Motions Addressed to Count 1.*

Count 1 clearly states all elements of a conspiracy to defraud the United States, and contrary to his assertions in Motion #42, North had fair notice that the conduct charged was subject to criminal charges. In 1924, the Supreme Court described defrauding the United States in terms that clearly encompass North's conduct as alleged. Chief Justice Taft said:

To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct

one of its lawful government functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out governmental intention. *Hammerschmidt v. United States,* 265 U.S. 182, 188 [44 S.Ct. 511, 512, 68 L.Ed. 968] (1924).

*See also, United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *(en banc ), cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed. 2d 250 (1977); *United States v. Lewis,* 716 F.2d 16, 23 (D.C.Cir.1983).

■ The Count does not charge multiple conspiracies, to violate laws and to conceal the violations, as North asserts in Motion # 44. The indictment clearly alleges a conspiracy which involved concealing the very existence of the profits of the enterprise from the start and hiding from Congress information relating to the conspirators' assistance for the contras. Its purpose depended on deceit from the start, and acts of concealment were actually part of the commission of the substantive crime. The cover-up elements of the conspiracy were not improperly added to stretch the statute of limitations to cover the conspiracy. *See, Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Forman v. United States,* 361 U.S. 416, 422–424, 80 S.Ct. 481, 485–86, 4 L.Ed.2d 412 (1960), *reh. denied,* 362 U.S. 937, 80 S.Ct. 749, 4 L.Ed.2d 751. One single conspiracy is alleged. The Independent Counsel must convince the jury that a conspiratorial agreement existed, with each co-conspirator having a specific intent to further a common unlawful objective, *United States v. Tarantino,* 846 F.2d 1384, 1391–1392 (D.C.Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), but that agreement may have several objects, including concealment. *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

■ References to the Boland Amendments[1] will not be stricken from these counts of the indictment. Contrary to North's assertions in Motion # 39, the references are appropriate to the charges in both counts 1 and 2, as well as to later counts in the indictment. Moreover, nothing has been presented to date that requires the Court to address the constitutional claim regarding the Boland Amendments or to question the legality of determinations made by the President in his

1. Two versions of the Boland Amendment applied during the time period relevant to Count One. Section 8066(a) of the Department of Defense Appropriations Bill, enacted as Section 8066 of P.L. 98–473, effective from October 12, 1984 to December 19, 1985, provided:

(a) During fiscal year 1985, no funds available to the Central Intelligence Agency, the Department of Defense, or any other agency or entity of the United States involved in intelligence activities may be obligated or expended for the purpose or which would have the effect of supporting, directly or indirectly, military or paramilitary operations in Nicaragua by any nation, group, organization, movement, or individual.

Part (b) contained provisions relating to conditions in which the prohibition would cease. These provisions, including a Presidential report to Congress and a joint resolution approving assistance, were never fully met. Humanitarian aid was provided, beginning in August, 1985, through separate legislation, 99–83, Section 722, and other laws permitted some information to be exchanged.

On December 4, 1985, another Boland Amendment was enacted as Section 105 of P.L. 99–169. It was in effect until October 18, 1986 and provided:

Funds available to the Central Intelligence Agency, the Department of Defense or any other agency or entity of the United States involved in intelligence activities may be obligated and expended in fiscal year 1986 to provide funds, materiel, or other assistance to the Nicaraguan democratic resistance to support military or paramilitary operations in Nicaragua only as authorized in section 101 and as specified in the classified Schedule of Authorizations referred to in section 102, or pursuant to section 502 of the National Security Act of 1947, or to section 106 of the Supplemental Appropriations Act, 1985 (P.L. 99–88).

The classified schedule and other provisions mentioned, in addition to the relevant report and Public Law 99–190, Section 8050, reveal Congressional intent to restrict lethal military or paramilitary supplies to the contras.

working arrangements with the National Security Council.

North contends, in effect, that even if he was engaged in conduct that was inconsistent with the intent of the Boland Amendments, as the indictment recites, he still has not interfered with or obstructed a "lawful governmental function" by his effort to misrepresent what he was doing. The Boland Amendments are unconstitutional, he contends, because they attempt to regulate how the President should conduct foreign policy and, in any event, they were never meant to apply to the National Security Council. Thus according to North's view, his misrepresentations and evasions did not interfere with a lawful governmental function.

The difficulty with this argument is that the President and the White House staff, whatever their doubts as to the constitutional propriety of some aspects of the Boland Amendments as they applied to the NSC, were functioning in respect to pertinent aspects of this case as if they were in compliance with Boland.[2] While any White House uncertainty may bear on North's intent under certain counts, his understanding as to the constitutionality of Boland in no way affords an excuse for his alleged misconduct or entitled him to obstruct the way the government was, in fact, functioning. The President signed the laws containing the Boland Amendments and he apparently decided to comply with relevant aspects of the Boland Amendments, and was willing to respond to Congressional committee inquiries relating to compliance with the Boland Amendments. As discussed in the Court's memorandum filed November 29, 1988, North did not refuse to answer Congressional inquiries on the grounds that Congress had no constitutional right to query National Security Council officials with respect to covert acts being conducted through employees of the NSC. In fact, he is alleged to have asserted his, and the NSC's full compliance with the Boland Amendment. (See, *Memorandum re Defendant North's Motions to Dismiss Counts 5, 6, and 7, Charging North with Making False Statements to Congress.*)

The President was free within the prerogatives of his office to comply with the prohibitions of the Boland Amendments or to resist them in whole or in part if compliance would have unduly infringed on his responsibilities in the realm of foreign relations and national security. The language of the Boland Amendments is not precise in some pertinent respects and it has many aspects, but these ambiguities are of no consequence where the Executive and the Legislative branches act in harmony. If, as Independent Counsel contends he is prepared to prove, the President, both previous and subsequent to the enactment of Boland, chose to limit the activities of the National Security Council by directives and Executive Orders that were consistent with the Boland Amendments, North's alleged unauthorized deviation from such limitations must be viewed as contrary to lawful government functions. Thus he is alleged to have defrauded the United States. Similarly, if the President in some respect took, for example, a narrow view of the words "supporting" or "support" in the texts of the Amendments and authorized certain types of diplomatic contact with other nations vis-a-vis Nicaragua, North cannot be held to a higher standard if an aspect of his own conduct in this regard was so authorized. Thus, under all these circumstances, a facial attack on the constitutionality of the Boland Amendments is misplaced. As in most criminal cases, there are facts to be resolved, and separation of powers theo-

2. Another difficulty with North's motion to dismiss is that the conspiracy alleged involves more than just a conspiracy to circumvent Boland's restrictions. The conspiracy to defraud the United States has three parts, only the first of which hinges in large part on Boland. The second part involves conflicts of interest and self-dealing with respect to creation and disposition of surplus funds from the arms sales to Iran. The third part involves the corruption of the arms deals with Iran, and departures from its specified functions as stated in the President's written authorization. In addition to the three parts of the conspiracy to defraud the United States, the indictment also alleges a conspiracy to violate five separate substantive offenses.

ries—over which much dispute exists—do not come under consideration if the facts show the affected Branches have accommodated to each other's interest to establish the manner in which government will function.

■ The Court also refuses to strike references to Executive Order 12333 and National Security Decision Directive 159 and to preclude evidence relating to these provisions, as North urges in Motion # 41.[3] These orders form part of the framework of laws and regulations which North is alleged to have conspired to circumvent and impair. That they themselves do not carry criminal penalties is of no consequence. These are counts alleging conspiracy to defraud the United States and defeat its lawful governmental functions.

■ Moreover, the political question doctrine does not require dismissal of Counts 1 and 2, as the motion papers (# 40) suggest. Not every matter touching on foreign affairs is barred by the political question doctrine. *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 229–230, 106 S.Ct. 2860, 2865–66, 92 L.Ed.2d 166 (1986); *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1969). It is the Court's duty to interpret statutes and Executive Orders, *See, Japan Whaling*, 478 U.S. at 227, 106 S.Ct. at 2864, and the indictment does not indicate that the case should be dismissed as involving a non-justiciable political question. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511–1515 (D.C.Cir.1984) (*en banc*), *vacated on other grounds*, 471 U.S.

1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). Trial will not require resolution of questions committed by the text of the Constitution to a coordinate branch. The facts of the case, while complex, are not beyond judicial ken. *United States v. Duggan*, 743 F.2d 59, 74 (2d Cir.1984). Moreover, prudence does not in fact counsel dismissal in the circumstances of this case, as North contends. It would be imprudent to dismiss the case on political question grounds simply because sensitive covert activities may be involved, or because the Congress and an employee of the President may have different views of an issue relating to foreign affairs. The President's conduct in implementing his foreign policy or intelligence functions is not being brought under scrutiny. Rather, it is what he did and authorized or didn't authorize that controls the outcome of this claim, and the Court need not explore the purposes of the Iran initiative beyond the President's formal written statement of its purposes.

## Motions Addressed to Count 2.

All claims addressed to Count 2 are covered by the foregoing, except Motion No. 45 seeking dismissal for failure to state an offense.

■ Count 2 is sufficient to charge a violation of 18 U.S.C. § 641.[4] The allegations underlying Count Two concern the generation of excess funds stemming from arms sales to Iran and the diversion of these funds to the Enterprise, for personal enrichment of some of the co-conspirators and use in projects designated by them-

---

**3.** Executive Order 12333, promulgated by the President in December of 1981, prohibits any United States intelligence agency, with the exception of the Central Intelligence Agency, from conducting covert actions with a Presidential finding that the agency was more likely than the CIA to achieve a particular objective. In early 1985, the President signed NSDD 159, which required the President to specifically approve by a written finding all covert actions undertaken by any United States Government agency or entity. NSDD also states that each covert action is also considered a significant anticipated intelligence activity under Section 501 of the National Security Act and is subject to certain Congressional reporting requirements.

**4.** 18 U.S.C. § 641 provides that:
"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
"Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
"Shall be fined...."

selves, such as sending lethal military supplies to the Nicaraguan resistance.

Among other things, conversion of government funds is specifically alleged. Regardless of ancient common law definitions, this more modern statute includes conversion, which "... adds significantly to the range of protection of government property ..." *Morissette v. United States*, 342 U.S. 246, 272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952). Justice Jackson's delineation of the elements of conversion in *Morissette* closely fits the allegations of this count, that is, that North wrongfully deprived another of possession of property. *Id.*, at 276, 72 S.Ct. at 256. Conversion may encompass a wide variety of acts:

> Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining....

342 U.S. at 271–72, 72 S.Ct. at 254. Thus the count must stand as stating a more limited conspiracy within the larger scope of Count One. It can be considered as stating an alternative claim of conversion. The Court is presently unable on the papers and arguments to resolve whether or not the facts to be presented will support embezzlement and theft under the same claim.

*Motions Addressed to Count 3.*

■ Count 3 is, in many ways, a purely cumulative count. The difficulty of charging the jury with the elements of Count 1 and then attempting to charge the narrower confines of this wire fraud count suggested by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) presents a likelihood of creating substantial confusion in the minds of the jurors. Evidence going to a deprivation of honest and faithful services would be relevant for Count 1, for instance, but the jury could only consider deprivations of property for Count 3. The difficulty of untangling the elements of these alleged frauds would require the Court at a minimum to sever the count to avoid confusion. Yet severance would do an injustice to North who should stand trial but once. Count 3 is dismissed.

It is obviously clear from the foregoing that neither Count 1 nor Count 2 states a novel legal theory (# 49). They each allege well-established offenses.

SO ORDERED.