RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JASON GETSY,

　　　　　　　*Petitioner-Appellant,*

　　　　*v.*

BETTY MITCHELL, Warden,

　　　　　　　*Respondent-Appellee.*

No. 03-3200

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00380—Dan A. Polster, District Judge.

Argued: March 7, 2007

Decided and Filed: July 25, 2007

Before: BOGGS, Chief Judge; MERRITT, MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, McKEAGUE, and GRIFFIN, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Michael J. Benza, Cleveland, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Cleveland, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, Cleveland, Ohio, David C. Stebbins, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Cleveland, Ohio, Elise W. Porter, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.

　　　　GILMAN, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER, GIBBONS, ROGERS, SUTTON, McKEAGUE, and GRIFFIN, JJ., joined. MERRITT, J. (pp. 19-25, delivered a separate dissenting opinion, in which MARTIN, DAUGHTREY, MOORE, COLE, and CLAY, JJ., joined. MARTIN, J. (pp. 26-27), joined by Judge MERRITT, and MOORE, J. (p. 28), joined by Judge MERRITT, also delivered separate dissenting opinions.

---

[*]The Honorable Deborah L. Cook, Circuit Judge, took no part in the consideration or decision of the case.

1

---
**OPINION**
---

RONALD LEE GILMAN, Circuit Judge. In September of 1996, an Ohio jury convicted Jason Getsy of murder-for-hire in connection with the killing of Ann Serafino and recommended that he be sentenced to death. The state trial court concurred, and Getsy received no relief either on direct appeal or in state postconviction proceedings. He thereafter filed a petition for federal habeas corpus relief. Getsy's petition was denied by the district court, but a panel of this court reversed the district court's judgment with regard to his death sentence. The panel majority held that Getsy's death sentence was unconstitutionally disproportionate to the life sentence that the separately tried instigator of the plot received for procuring the murder. It also remanded the case for an evidentiary hearing regarding Getsy's claim of judicial bias against the state trial-court judge. Thereafter, this court granted the Warden's petition for en banc review and vacated the panel decision. For the reasons set forth below, we **AFFIRM** the district court's denial of Getsy's habeas corpus petition.

## I. BACKGROUND

### A.     Factual background

The Ohio Supreme Court set forth the relevant facts as follows:

Charles ("Chuckie") Serafino lived with his mother, Ann Serafino. On the evening of July 6, 1995, Ann went to bed at approximately 11:00 p.m. Chuckie was on the love seat in the family room when, sometime after 1:00 a.m. on July 7, he heard a loud explosion. Shells from a shotgun blasted out the sliding glass door behind him and wounded him in the arm. As he ran for the bathroom to inspect his injuries, Ann came out of her bedroom. Chuckie remembered hearing his mother say to someone, "What are you doing here? Get out of here." He also remembered hearing someone say, "Shoot the bitch," or "Kill the bitch." Serafino next recalled seeing a gun in his face and being shot again. He fell to the bathroom floor and pretended to be dead. After the intruders left, he called 911.

Frederick Hanley, Jr., Chuckie's neighbor, jumped from his bed upon hearing gunshots. He looked at his digital alarm clock, which read 1:22 a.m. As he was going downstairs, he heard at least one additional gunshot. Once outside, he heard footsteps that appeared to be running away from the Serafino residence. He instructed his wife to call 911 and inform the police that shots were coming from the Serafino residence and that someone was running towards the city of Hubbard.

Officer Thomas Forgacs of the city of Hubbard Police Department was one of the first officers to respond to the call. The officers broke into the Serafino home and found Chuckie lying on the floor with blood all over him. Chuckie asked the officers to check his mother; she was dead.

Forgacs left the scene and began checking the Hubbard area for a white Crown Victoria owned by John Santine. Forgacs went to 24 1/2 South Main Street, where he had seen Santine's car parked on the evening of July 6. He found Santine's car parked in the driveway with another car pulled in behind it.

Earlier in the year, Santine had attempted to purchase a portion of Chuckie Serafino's lawn-care business and had deposited $2,500 in the business's account. Subsequently, Chuckie violated probation and was incarcerated in the Trumbull

County Jail until July 6, 1995. While Chuckie was in jail, Santine attempted to take over Chuckie's business. Santine transferred Chuckie's building lease and equipment into his own name, which caused an altercation between Santine and Ann Serafino and Chuckie's sister. The Serafinos filed a civil action against Santine while Chuckie was still in jail.

Forgacs searched for Santine's car because of a conversation he had had on June 20, 1995 with Richard McNulty. McNulty, who lived at 24 1/2 South Main and who is a co-defendant, had previously served as a police informant. On June 20, Forgacs asked McNulty, who worked for Santine, "What does Johnny have in store for Chuckie when he gets out of jail?" McNulty told Forgacs, "He's dead. He's bought and paid for." McNulty told Forgacs that Santine had lined up a hit man, Tony Antone, to kill Chuckie Serafino. Forgacs gave little credence to McNulty's statements, and didn't inform Chuckie or follow up on the information.

Forgacs returned to the murder scene and told the Hubbard Township Police what McNulty had told him a few weeks earlier. Later that morning, Detective Donald Michael Begeot of the Hubbard Township Police Department and Forgacs went to the McNulty apartment at 24 1/2 South Main to take McNulty in for questioning.

Initially, McNulty minimized his involvement and denied that he had told Forgacs about the contract on Chuckie. Based on other information obtained from McNulty, Begeot obtained an arrest warrant for Getsy. At approximately 10:00 p.m. on July 7, 1995, Getsy was arrested in the driveway of 24 1/2 South Main. He was given Miranda warnings at the scene and later at the Hubbard Township Police Department. At approximately 1:00 a.m., on July 8, 1995, Getsy gave a videotaped interview.

Getsy told Begeot that Ben Hudach called him on the evening of July 6, 1995, and told him to come to 24 1/2 South Main Street. When Getsy got there, Hudach, a co-defendant, told Getsy that they (Getsy, Hudach, and McNulty) had to "take out some guy." Santine was not present, but Hudach related what Santine had told him earlier. Money had been discussed, but Hudach was not sure of the amount. Getsy later indicated that he participated in the shootings because he was scared of Santine, but did not do it for the money.

Sometime on July 6, 1995, Getsy, Hudach, and McNulty drove to the Serafino residence. They could not find a place to park so they returned to 24 1/2 South Main Street. When they returned, Santine was at the apartment and drove them back to the Serafino house. Getsy described the guns that they took with them, which included a shotgun, a SKS rifle, and a .357 magnum handgun.

Getsy explained that after Santine dropped them off, Hudach sprained his ankle and went back to where they were supposed to be picked up. Getsy stated, "[T]hat left me and Rick to get it done." He admitted that what they were supposed to do was kill Chuckie Serafino.

Getsy explained that he and McNulty fired simultaneously through the sliding glass door on the back of the Serafino house. They entered the house through the shattered door and shot at Chuckie as he was running down the hall. When they saw Ann Serafino, Getsy stated, they "just kept shooting."

During the interview with Begeot, Getsy was reluctant to mention Santine's name. He told Begeot that the same thing that happened last night could happen to him. He

asked whether Santine would ever see the interview tape. Begeot assured Getsy that Santine would not be able to get to him. Getsy also asked Begeot if he was going to die, and Begeot told him, "No."

Getsy admitted that he had the SKS rifle and the handgun during the shootings. He explained that when he was shooting the SKS, the clip fell out so he had to pull out the handgun.

Getsy's description of the weapons he and McNulty used was verified by physical evidence recovered at the scene. Michael Roberts, a forensic scientist, identified the projectiles recovered from the murder scene. None of the projectiles found outside the family room area, where the sliding glass door was blown out, was discharged by the shotgun which, according to Getsy, McNulty carried and fired. The projectiles linked to the shotgun were recovered in the family room.

Getsy admitted that they had been instructed to kill any witnesses. When Begeot asked him what they were told about witnesses in the house, Getsy replied, "[I]f we were seen, to do them, too."

After the shootings, Hudach called Santine to tell him it was finished and to pick them up. Santine told Hudach that there were cops everywhere and that they should run through the woods to get back to the apartment. Santine also told Hudach to ditch the guns in the woods.

Getsy, McNulty, and Hudach arrived back at 24 1/2 South Main, where Josh Koch and Santine were waiting for them. Santine ordered them to take off their clothes and take a bath. Getsy was the last to bathe. When he came out of the bathroom, his clothes and boots were gone. He did not know what happened to them.

Koch testified that he was at 24 1/2 South Main Street on July 6 and 7, 1995. He knew that Getsy, McNulty, and Hudach were going out to do something for Santine, but they declined to give him any details. He was to watch TV and write down the shows that were on so the other three could memorize the list for an alibi.

After Getsy, McNulty, and Hudach left, Koch waited in the apartment. Santine came to the apartment and, sometime around 1:00 a.m., jumped up and said, "I heard the gunshots." Immediately thereafter, the telephone rang and Koch heard Santine talking to someone in a fast, excited manner. Santine said, "So you killed them, right, you killed them both? * * * Okay. Well, I can't come pick you up. The cops are everywhere, they are pulling over everybody, you got to run through the woods and ditch the guns." Santine hung up and happily screamed, "I fucking love these guys."

According to Koch, Santine was very pleased with the three men. He said, "You guys want $10,000? I'll give you $10,000." McNulty told him he just wanted a wedding ring for his girlfriend. Hudach said that it had been a favor for Santine. Getsy indicated that he needed money for his car.

The next day, Koch heard Getsy bragging to Patricia Lawson about shooting Ann Serafino. Getsy grabbed a piece of pizza with no cheese on it and said, "This looks just like this bitch's face after we shot her."

Michael Dripps, a close friend of Getsy, McNulty, and Hudach, acknowledged that Getsy was happy, secure, and tough when he had a gun in his hand. Dripps was

present at the lawn-care business when Gum-out had been used to wipe prints off the weapons before the Serafino shootings. Dripps heard Santine instruct Getsy, McNulty, and Hudach to kill Chuckie Serafino and all witnesses. Dripps also observed McNulty and Hudach in camouflage clothing on the night of the killing.

*State v. Getsy*, 702 N.E.2d 866, 873-75 (Ohio 1998).

## B.    Procedural background

In July of 1995, an Ohio grand jury indicted Getsy for the aggravated murder of Ann Serafino, the attempted murder of Charles Serafino, and related charges that included aggravated burglary. The indictment also charged Getsy with three capital specifications that rendered him eligible for the death penalty, including: (1) murder or attempted murder of two or more people, (2) murder for hire, and (3) felony murder. Getsy proceeded to trial in July of 1996 and was ultimately found guilty of all charges and specifications. Following a penalty-phase hearing, the jury recommended that Getsy be sentenced to death. The trial judge accepted the jury's recommendation and imposed a sentence of death for the aggravated murder charge.

Getsy appealed to the Ohio Supreme Court, raising 17 claims of error. The Court affirmed Getsy's sentence and conviction as to all grounds raised. *Getsy*, 702 N.E.2d at 893. Simultaneously with his direct appeal, Getsy also filed a petition for state postconviction relief. The Ohio trial court denied his petition for relief, and the Ohio Supreme Court declined to hear his postconviction appeal. Subsequently, the Ohio Supreme Court summarily denied Getsy's application to reopen his direct appeal.

Having exhausted all of his state-court remedies, Getsy filed a petition in federal district court for habeas corpus relief pursuant to 28 U.S.C. § 2254. Getsy's habeas petition raised 21 separate claims of error, 2 of which the district court dismissed as defaulted and the remainder of which the court denied on the merits. The only issue that the district court certified for appeal was whether Getsy's sentence was unconstitutionally arbitrary and disproportionate in relation to that imposed on Santine. On appeal, this court expanded Getsy's Certificate of Appealability (COA) to include seven additional claims: (1) whether Getsy's due process rights were violated by the failure of the trial judge to recuse himself, (2) whether Getsy's confession was obtained knowingly and voluntarily, (3) whether Getsy was denied the right to a fair and impartial jury, (4) whether Getsy was denied his right to the effective assistance of counsel in the penalty phase of his trial, (5) whether sufficient evidence supported Getsy's conviction regarding the murder-for-hire aggravating circumstance, (6) whether the Ohio prosecutor improperly engaged in selective prosecution by seeking the death penalty against Getsy, and (7) whether the errors asserted had the cumulative effect of denying Getsy the due process of law.

A panel of this court reversed the judgment of the district court regarding Getsy's death sentence, holding that it was unconstitutionally arbitrary and disproportionate in relation to the life sentence received by Santine in a separate trial. *Getsy v. Mitchell*, 456 F.3d 575, 598 (6th Cir. 2006), *reh'g en banc granted*, *opinion vacated*. The panel majority also remanded Getsy's claim of judicial bias for an evidentiary hearing. *Id*. at 595. Subsequently, the Warden petitioned this court to rehear Getsy's appeal en banc. We granted the petition for rehearing and vacated the panel decision in November of 2006.

## II.  ANALYSIS

### A.     Standard of review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court

> may not grant a writ of habeas [corpus] to a petitioner in state custody with respect
> to any claim adjudicated on the merits in state court unless (1) the state court's
> decision "was contrary to, or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme Court" . . . or (2) the state
> court's decision "was based on an unreasonable determination of the facts in light
> of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (quoting 28 U.S.C. § 2254(d)).  "A state court's legal decision is 'contrary to' clearly established federal law . . . if the state court arrived at the conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than a Supreme Court decision on a set of materially indistinguishable facts."  *Lopez v. Wilson*, 426 F.3d 339, 342 (6th Cir. 2005) (en banc). Alternatively, a state court decision will not be held to be an "unreasonable application" of clearly established federal law unless the decision is "objectively unreasonable," not simply erroneous or incorrect. *Williams v. Taylor*, 529 U.S. 362, 409-11 (2000).

### B.     Proportionality

The primary issue raised by Getsy, and the only issue certified for appeal by the district court, is whether Getsy's sentence was unconstitutionally arbitrary or disproportionate in relation to that received by Santine.  Getsy's argument ultimately rests on the fact that Santine, the mastermind who directed codefendants Getsy, Hudach, and McNulty to kill Charles Serafino, did not receive the death penalty.  Santine's indictment mirrored Getsy's.  In a separate trial that took place after Getsy's, Santine was convicted of aggravated murder and aggravated burglary, but was acquitted of all the capital specifications charged and thus ineligible for the death penalty.  Getsy claims that this disparity renders his death sentence arbitrary and disproportionate.

On direct review, the Ohio Supreme Court first addressed Getsy's related contention that Ohio's death penalty procedures are flawed because the court "limits itself to death cases when conducting its statutorily mandated proportionality review." *Getsy*, 702 N.E.2d at 889.  Relying on its decision in *State v. Steffen*, 509 N.E.2d 383, 386 (Ohio 1987), which held that "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed," the Court summarily rejected Getsy's argument.  The Court next independently reviewed Getsy's death sentence for appropriateness and proportionality pursuant to Ohio Rev. Code Ann. § 2929.05. *Getsy*, 702 N.E.2d at 889.  Comparing Getsy's case to other similar murder-for-hire death penalty cases in Ohio, the Court concluded that "it is clear that imposing the death sentence on Getsy is not disproportionate." *Id*. at 892.

Getsy renews his claim of arbitrariness and disproportionality before us en banc.  At oral argument, Getsy's counsel conceded that Getsy's death sentence was not arbitrary or disproportionate at the time that it was imposed.  Instead, Getsy contends that his sentence became unconstitutional only later when a different jury sentenced Santine to life imprisonment for his role in the same offenses.  According to Getsy, *Furman v. Georgia*, 408 U.S. 238 (1972), *Gregg v. Georgia*, 428 U.S. 153 (1976), and their progeny establish a duty on the part of the Ohio Supreme Court to "correct this arbitrary and capricious sentence."  This argument, in our opinion, advocates a novel constitutional rule that Supreme Court precedent simply does not support, let alone dictate.

Getsy accurately asserts that the fractured majority holding in *Furman* has come to stand for the general principle that the arbitrary and disproportionate imposition of the death penalty violates the Eighth Amendment. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 657 (1990) (noting that *Furman* "has come to stand for the principle that a sentencer's discretion to return a death sentence must be constrained by specific standards, so that the death penalty is not inflicted in a random and capricious fashion"), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Proceeding from this abstract principle to the specific conclusion urged by Getsy—that his sentence was unconstitutionally arbitrary or disproportionate in relation to that of Santine—necessarily entails at least one of two additional premises: (1) that the Eighth Amendment requires comparative proportionality, or (2) that a rule of consistency applies regarding death-specification verdicts among separately tried coconspirators. These premises, however, have been disclaimed both by this court and by the Supreme Court.

Eighth Amendment proportionality, as defined by the Supreme Court, refers "to an abstract evaluation of the appropriateness of a sentence for a particular crime." *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984) (holding that the petitioner was not constitutionally entitled to a proportionality review that would "compare Harris's sentence with the sentences imposed in similar capital cases"). Proportionality as defined by the Supreme Court evaluates a particular defendant's culpability for his crime in relation to the punishment that he has received. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304 (2002) (reversing the death sentence of a mentally retarded defendant); *Enmund v. Florida*, 458 U.S. 782 (1982) (reversing the death sentence of a defendant who did not himself take life, attempt to take life, or intend to take life); *Coker v. Georgia*, 433 U.S. 584 (1977) (reversing the death sentence of a defendant for the rape of an adult woman that did not result in her death). In each of these cases, the Supreme Court struck down a death sentence not because it was disproportionate in comparison to sentences received by other, similarly situated defendants, but because of what the Court deemed to be the inappropriateness of the sentence in relation to the particular characteristics of the crime and the criminal at issue. These cases are of no help to Getsy, a competent adult who personally and intentionally committed aggravated murder.

Unlike this absolute or individualized proportionality, Getsy's proportionality argument rests on a claim that his death sentence is disproportionate only by comparison to Santine's life sentence. In *Pulley*, the Supreme Court considered the precise argument asserted by Getsy—that the Constitution demands a comparative proportionality review that "purports to inquire . . . whether the penalty is . . . unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime." *Pulley*, 465 U.S. at 44. The Court squarely rejected this argument as contrary to its holdings in *Jurek v. Texas*, 428 U.S. 262 (1976), *Gregg v. Georgia*, 428 U.S. 153 (1976), and *Profitt v. Florida*, 428 U.S. 242 (1976). *Pulley*, 465 U.S. at 50-51. Three years later, the Court reaffirmed *Pulley*'s holding in *McKleskey v. Kemp*, 481 U.S. 279 (1987). In that case, the Court expressly held that a defendant could not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McKleskey*, 481 U.S. at 306-07 (emphasis in original).

Our sister circuits have also recognized this well-established principle. *See, e.g.*, *Beardslee v. Woodford*, 358 F.3d 560, 579-81 (9th Cir. 2004) (rejecting the argument that "different sentences for equally culpable co-defendants violate the prohibition against arbitrary imposition of the death penalty in *Furman*," and concluding that no constitutional error arose from the trial court's refusal to allow the codefendants' sentences into evidence); *Bush v. Singletary*, 99 F.3d 373, 375 (11th Cir. 1996) (per curiam) (holding that no federal constitutional claim arose by reason of the fact that the defendant's death sentence was disproportionate to that of his codefendant, whose death sentence had been vacated on appeal); *Hatch v. Oklahoma*, 58 F.3d 1447, 1466 (10th Cir. 1995) (rejecting the defendant's claim that the Constitution required "a proportionality review of his sentence relative only to his codefendant"), *overruled in part on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001); *Russell v. Collins*, 998 F.2d 1287, 1294 (5th Cir. 1993) (denying

relief to a habeas petitioner who argued that his death sentence was disproportionate to that of a codefendant who had pled guilty and been sentenced to 60 years in prison).

By statutorily incorporating a form of comparative proportionality review that compares a defendant's death sentence to others who have also received a sentence of death, Ohio's death penalty regime actually adds an additional safeguard beyond the requirements of the Eighth Amendment. *See Steffen*, 509 N.E.2d at 386. This additional form of review excludes from the precedents used for comparison all cases, like Santine's, where the sentence received was other than death. *Id.*

In an unbroken line of precedent, this court has upheld challenges to Ohio's limited comparative-proportionality review. "Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison"; therefore "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed" falls within this wide latitude. *Williams v. Bagley*, 380 F.3d 932, 962-63 (6th Cir. 2004) (citing seven prior Sixth Circuit cases that have upheld Ohio's limited proportionality review against constitutional challenges).

Getsy attempts to distinguish this longstanding proposition that Ohio need not have even considered the very ground upon which his constitutional claim is based—that a similarly situated defendant received a life sentence—by narrowing his argument. He contends that, although Ohio need not systematically engage in comparative proportionality review as a general matter, its failure to do so in this case, where the mastermind of the plot was acquitted of all capital specifications, gives rise to a constitutional violation. This amounts to a thinly veiled argument that consistent capital-specification verdicts among separately tried coconspirators (in this case, participants in a murder-for-hire scheme) are required.

In the absence of case law for this specific proposition, Getsy asserts that *Furman*'s broad prohibition against arbitrary and capricious death sentences somehow dictates the further leap to a consistency principle in capital cases. Getsy's counsel properly conceded at oral argument that the Supreme Court has never held that the Eighth Amendment requires such a rule of consistency. To the contrary, the Supreme Court has explicitly rejected the common-law rule of consistency in other contexts. *See, e.g.*, *United States v. Powell*, 469 U.S. 57, 58 (1984) (reaffirming the holding in *Dunn v. United States*, 284 U.S. 390 (1932), that "a criminal defendant convicted by a jury on one count could not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count"). Nearly all courts to have addressed the issue since *Powell*—including our own—have concluded that the rule of consistency regarding verdicts *even in a single trial* is no longer good law. *See United States v. Crayton*, 357 F.3d 560, 565-66 (6th Cir. 2004) (explaining that "the acquittal of all but one co-conspirator during the same trial does not necessarily indicate that the jury found no agreement to act," and collecting cases from eight other circuits).

Moreover, we have long held that the common-law rule of consistency has no application to conflicting verdicts returned by different juries in *separate trials*. *See United States v. Newton*, 389 F.3d 631, 636 (6th Cir. 2004) (noting that the rule of consistency "was not applied if co-conspirators were separately tried"), *vacated in part on other grounds*, 126 S. Ct. 280 (2005); *United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986) ("[I]f coconspirators are tried separately, the acquittal of all other coconspirators does not mandate acquittal as to the remaining conspirator. . . . In other words, it is not necessarily inconsistent for two juries to reach differing results."); *see also Cortis v. Kenney*, 995 F.2d 838, 840 (8th Cir. 1993) (same); *United States v. Lewis*, 716 F.2d 16, 22 (D.C. Cir. 1983) (same); *United States v. Sangmeister*, 685 F.2d 1124, 1126-27 (9th Cir. 1982) (same); *United States v. Espinosa-Cerpa*, 630 F.2d 328, 333 (5th Cir. 1980) (same). This well-established precedent squarely precludes the old common-law rule from applying under the circumstances of this case.

Getsy simply had no constitutional guarantee that his jury would reach the same results as prior or future juries dealing with similar facts, irrespective of the offense with which he was charged. Criminal defendants are instead protected from irrational convictions by the due process requirement that a conviction must be supported by sufficient evidence. *Powell*, 469 U.S. at 67 ("[A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. We do not believe that further safeguards against jury irrationality are necessary."); *see also Espinosa-Cerpa*, 630 F.2d. at 332 n.5 (explaining the ancient origin of the English common-law rule of consistency and "its inappropriateness to a modern American criminal system in which all verdicts obviously are, and always have been, subject to independent review for evidentiary support"). Thus, the constitutionality of Getsy's murder-for-hire conviction turns not on any fortuity regarding when he was tried or with whom, nor on the caprice permissible in another jury's decision to acquit on similar facts, but rather on the sufficiency of the evidence presented at his own trial.

Only where a *court* declares that the evidence is *legally insufficient* to support the conspiracy conviction of one defendant must the conviction of the sole coconspirator also be voided. *Morrison v. California*, 291 U.S. 82, 93 (1934) (reversing two defendants' joint conspiracy convictions where due process precluded the state's reliance on a legal presumption to establish an element of the conspiracy). We pause to emphasize that, contrary to the view of the dissent, "[a] court's determination that there is insufficient evidence to convict cannot be equated with a jury's determination that a defendant, for whatever reason, should be acquitted." *Crayton*, 357 F.3d at 566. Apparently recognizing this fundamental distinction, Getsy himself has never argued that *Morrison* applies to his case, even in the wake of the original-panel majority's unwarranted reliance on that decision. Nevertheless, the dissent presses on with this argument, overlooking the critical distinction between a determination made by a court as a matter of law—with which *Morrison* dealt—and a jury verdict. (All discussion in this opinion of the dissent or the dissenting opinion refers to the lead dissent authored by Judge Merritt.)

Santine's case was allowed to go to a jury, and that jury ultimately acquitted him of the murder-for-hire specification. But the very fact that the issue was submitted to a jury indicates that the evidence against him was not so deficient that the trial court could decide the question as a matter of law. Furthermore, jury verdicts differ intrinsically from decisions made by a court. *See Crayton*, 357 F.3d at 566; *see also Powell*, 469 U.S. at 66 (noting, in the context of inconsistent verdicts in a single trial, that "[t]he fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable"). Although the dissent points out that the Supreme Court has "never retracted or narrowed" the holding in *Morrison*, neither has the Court ever expanded it to require the reversal of one conspirator's conviction or sentence in light of a coconspirator's acquittal by a separate jury. Certainly *Enmund v. Florida*, 458 U.S. 782 (1982), in which the Supreme Court reversed the death sentence of a defendant on the ground that he did not personally kill or intend to kill anyone, was not such a case.

We also disagree with the dissent's view that considerations of consistency, even if relevant, would require "Getsy's death verdict [to] be set aside." Dissenting Op. at 25. Apart from the murder-for-hire capital specification, Getsy was also convicted of two other capital specifications—felony murder and attempted multiple murders—that do not necessarily conflict with the verdicts from Santine's trial. Getsy would therefore be entitled, at most, to a new penalty-phase hearing, not an outright voiding of his death sentence.

Ultimately, the question before us is whether the determination of the Ohio Supreme Court that Getsy's death sentence was not arbitrary or disproportionate was contrary to, or an unreasonable application of, clearly established federal law. As the above analysis demonstrates, clearly established federal law lends no support to Getsy's claim, with the relevant precedent actually

pointing the other way. To grant habeas relief despite such an obvious void of clearly established authority contravening the state court's decision would both violate AEDPA and amount to the retroactive application of a new constitutional rule of criminal procedure in violation of *Teague v. Lane*, 489 U.S. 288 (1989) (barring, with exceptions inapplicable here, the retroactive application of a new rule of constitutional law in a collateral proceeding). We therefore decline to adopt Getsy's proportionality argument.

The dissent's references to Aristotle, Sir Francis Bacon, Sir Edward Coke, and English cases beginning in the year 1599 strike us as quite scholarly, even if only marginally relevant. Obviously the controlling law is that of the United States Supreme Court, not the King's Bench. What the dissent's historical exposition fails to cite is even a single instance in which the Supreme Court or *any* federal court has ever reversed one defendant's sentence or conviction based on another defendant's later acquittal by a separate jury. The dissent does not, because it cannot, explain how such a supposedly well-established rule has remained hidden within this country's federal jurisprudence for so long a time.

This is not to say that the incongruous results from the separate trials of Getsy and Santine are not a matter of concern. We share that concern, recognizing at the same time that reasonable people can disagree over the relative moral turpitude of the instigator of an assassination on the one hand and the killer hired to carry out the violent act on the other. Nevertheless, we are not empowered to answer this philosophical question by bypassing the limitations that both Congress and the Supreme Court have placed upon our power to grant relief under the circumstances of this case.

Perhaps some day the Supreme Court will hold that a comparison between the culpability of a hired killer and that of his instigator is constitutionally required, and that inconsistent verdicts arising from their separate trials are unconstitutional. But this is not the law of the land today, and was obviously not the "clearly established law" at the time that the Ohio Supreme Court affirmed Getsy's conviction and sentence in 1999. For this reason, as well as the others set forth above, we do not believe that the judgment of the Ohio Supreme Court on the issue of proportionality is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

## C.    Judicial bias

As a second ground for habeas relief, Getsy asserts that his right to a fair trial was violated because Judge W. Wyatt McKay, the Ohio judge who presided over Getsy's trial, exhibited bias. Getsy's claim arises from events surrounding a picnic that took place in August of 1996, just after Getsy's trial had begun. The picnic was an annual event hosted by the Trumbull County judges. That year it was held at a home belonging to the mother of Trumbull County Court Judge Ronald Rice. Judge Rice's wife, Cynthia Rice, was one of the two prosecuting attorneys trying Getsy's case. Both Judge Rice and Cynthia Rice attended the party, as did Judge McKay and many other guests. While driving home from the picnic, Judge McKay was involved in a single-car accident and was ultimately charged with driving under the influence of alcohol (DUI). Judge McKay arrived late to court the next day wearing sunglasses and appearing to have bruises on his face, but Getsy's trial proceeded.

Upon learning of the incident through the media, Getsy filed a motion for a mistrial and for the disqualification of Judge McKay to try his case. He also filed an Affidavit of Disqualification against Judge McKay in the Ohio Supreme Court pursuant to Ohio Rev. Code Ann. § 2701.03. Chief Justice Moyer of the Ohio Supreme Court denied Getsy's motion on the ground that the "mere fact that a judge and an attorney attend the same social event does not mandate the judge's disqualification from pending cases involving that attorney." *In re Disqualification of McKay*, 674

N.E.2d 359 (Ohio 1996). Citing an affidavit submitted by Judge McKay, Chief Justice Moyer also noted that any contact between the judge and the assistant prosecutor consisted of nothing more than the "passing of simple social amenities." *Id.*

Following the denial of Getsy's Affidavit of Disqualification by the Ohio Supreme Court, Judge McKay brought in Judge John M. Stuard, a fellow Trumbull County judge with no connection to the case, to voir dire the jury regarding the DUI incident. This process revealed that only two jurors were aware of the incident, and both averred that it would not affect their ability to be fair and impartial. Judge McKay subsequently denied Getsy's motion for a mistrial and for disqualification, and denied Getsy's request for an evidentiary hearing on the matter. On direct review, the Ohio Supreme Court relied on Chief Justice Moyer's denial of Getsy's Affidavit of Disqualification in ruling against his judicial-bias argument. *Getsy*, 702 N.E.2d at 876.

Judge McKay's DUI prosecution overlapped with Getsy's trial. In order to avoid the appearance of impropriety, the Trumbull County Prosecutor's Office trying Getsy's case brought in a special prosecutor from neighboring Geauga County to prosecute Judge McKay. Ultimately, Judge McKay pled guilty to the DUI charge and was sentenced on September 5, 1996. Judge McKay's plea and sentencing thus followed the September 3, 1996 guilty verdict in Getsy's jury trial, but preceded the jury's death-sentence recommendation handed down on September 10, 1996 and Judge McKay's imposition of the death sentence on September 12, 1996.

Getsy's primary argument is that he is entitled to an evidentiary hearing to develop facts relevant to his judicial-bias claim. The district court denied Getsy's request for such a hearing. We will reverse a district court's denial of an evidentiary hearing only if the court abused its discretion. *Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005) (reciting that standard of review in affirming the denial of an evidentiary hearing). A district court abuses its discretion where it "applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005) (quotation marks omitted).

Section 2254(e)(2) sets forth certain preconditions to obtaining an evidentiary hearing in a habeas proceeding where a petitioner has "failed to develop the factual basis of a claim in State court proceedings." The Supreme Court has held that "failed" within the meaning of § 2254(e)(2) refers to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Here, Getsy sought to develop evidence regarding his judicial-bias claim both at trial and in his postconviction proceedings in state court. He has thus demonstrated diligence in accordance with § 2254(e)(2). *See id.* at 437 ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law.").

Although Getsy thus overcomes the initial statutory hurdle to obtaining a hearing, "the fact that [a petitioner] is not disqualified from receiving an evidentiary hearing under § 2254(e)(2) does not entitle him to one." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). The Supreme Court recently explained that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007); *see also Bowling*, 344 F.3d at 512 (determining that the district court's denial of an evidentiary hearing did not amount to an abuse of discretion after examining the following factors: whether the petitioner "alleges sufficient grounds for release," whether "relevant facts are in dispute," and whether the "state courts . . . h[e]ld a full and fair evidentiary hearing"). Furthermore, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Schriro*, 127 S. Ct. at 1940.

We must therefore determine, as a threshold matter, whether Getsy alleges sufficient grounds for relief under AEDPA's deferential standard. *Id.* Getsy's judicial-bias argument focuses on two different elements: (1) the allegedly improper ex parte contact between Judge McKay and assistant prosecutor Rice at the picnic, and (2) the potential conflict of interest arising from Judge McKay's own pending prosecution. Upon examination, we conclude that neither of these arguments demonstrates that the district court abused its discretion in denying Getsy's request for a hearing.

"[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no *actual* bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (emphasis added) (citation and quotation marks omitted). Under this standard, "[o]nly in the most extreme of cases would disqualification on the basis of bias and prejudice be constitutionally required." *Williams v. Anderson*, 460 F.3d 789, 814 (6th Cir. 2006) (brackets omitted) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)). Our judicial-bias inquiry is also informed by the Supreme Court's analysis of the federal statutory-recusal standard in *Liteky v. United States*, 510 U.S. 540, 552 (1994), in which the Court explained that "the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable."

Getsy's first claim essentially amounts to an observation that Judge McKay attended the same annual judicial picnic that assistant prosecutor Rice and many others attended. Based on this, Getsy speculates that Judge McKay and Rice might have interacted to an unknown extent. As this court has previously observed, however, "ex parte contact does not, in itself, evidence any kind of bias." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002) (noting that the petitioner had not even "come close" to stating a judicial-bias claim where he alleged that the trial judge answered jurors' questions in the jury room during deliberations and later stopped by a picnic that the jurors were having on a weekend to say hello).

The Supreme Court reaffirmed in *Bracy* that courts ordinarily "presume that public officials have properly discharged their duties." 520 U.S. at 909 (quotation marks omitted). Nonetheless, the Court granted an evidentiary hearing in that case in part because the petitioner had successfully rebutted the presumption by showing that the trial judge was "thoroughly steeped in corruption." *Id.* This corruption was evidenced by the judge's criminal conviction for accepting bribes in return for fixing cases. *Id.*

Getsy, by contrast, points to no events, either intrinsic or extrinsic to the proceedings, that evidence corruption or actual bias on the part of Judge McKay. Although Getsy suggests that Judge McKay might have been lying in his affidavit when he averred that he exchanged no more than social pleasantries with Rice at the picnic, Getsy offers nothing beyond such conjecture. We conclude that the district court did not abuse its discretion in denying Getsy a forum to question attendees of a picnic that occurred over 10 years ago in order to explore his unsupported speculation of improper communications between Judge McKay and Rice. *See Bracy*, 520 U.S. at 909 (noting that, had the petitioner not overcome the presumption of propriety, the Court "might well [have] agree[d]" that his theory of bias was "too speculative to warrant discovery"); *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) (affirming the district court's denial of an evidentiary hearing regarding the petitioner's allegations of a secret deal between the prosecutor and a trial witness where such a hearing would have been "tantamount to an impermissible fishing expedition").

Getsy's contention that the pending criminal charges against Judge McKay might have impermissibly biased the judge similarly fails to assert a valid ground for relief. His primary argument is that Judge McKay's prosecution was conducted by "the same prosecuting authority" that prosecuted Getsy. In fact, however, a special prosecutor from neighboring Geauga County was brought in to conduct Judge McKay's criminal proceedings. This distinguishes the cases cited by

Getsy for the proposition that an attorney who is himself prosecuted by the same office that is prosecuting his client might be laboring under a conflict of interest. *See, e.g., Thompkins v. Cohen*, 965 F.2d 330, 332-33 (7th Cir. 1992) (noting that the prosecution of an attorney by the same office that is prosecuting his client might give rise to a conflict, but finding that no constitutional violation had occurred in relation to the lawyer's representation in that case).

Again, Getsy points to nothing that suggests actual bias on the part of Judge McKay. The remote possibility that currying favor with Getsy's prosecutor would somehow help the judge in dealing with the special prosecutor in his own case does not present a ground that a reasonable observer would believe improperly influenced Judge McKay's decisions in Getsy's trial. *Williams*, 460 F.3d at 813 (noting that due process "prohibits a defendant from being tried before a judge whose 'substantial' and 'direct' interests may be furthered by the outcome of the trial"). The only specific example Getsy cites of a trial decision allegedly influenced by bias is Judge McKay's decision to accept the jury's recommendation and impose the death sentence. But the jury convicted Getsy of three capital specifications, any one of which could legally have supported the sentence imposed. Moreover, the record reflects that Judge McKay accepted the jury's recommendation and imposed the death sentence *after* his own plea and sentencing for the DUI charges were completed. Even under Getsy's conflict-of-interest theory, therefore, this decision would have been untainted.

We recognize that Judge McKay's conduct in becoming intoxicated at a picnic attended by assistant prosecutor Rice and then driving while impaired exhibited poor decisionmaking. These actions, however, are distinct in character from misdeeds such as accepting bribes to fix cases that warranted an evidentiary hearing in *Bracy*. Because Getsy's allegations of judicial bias are insufficient to support a claim for habeas relief, we conclude that the district court did not abuse its discretion in denying his request for an evidentiary hearing. For the same reasons, we conclude that the Ohio Supreme Court's denial on the merits of Getsy's judicial-bias claim was neither contrary to nor an unreasonable application of clearly established federal law.

**D.      Ineffective assistance of counsel during the penalty phase**

Getsy's third claim asserts that he received the ineffective assistance of counsel during the penalty phase of his trial. On direct review, the Ohio Court of Appeals and the Ohio Supreme Court determined that this claim lacked merit. The district court on habeas review agreed, and denied Getsy's petition regarding this claim. This issue was not reached by the original panel of this court in light of its grant of habeas relief on the proportionality issue.

We note at the outset that the extensive presentation of mitigating evidence put on by Getsy's counsel during the penalty phase demonstrated substantial investigation and preparation. Fourteen witnesses were called to testify on Getsy's behalf, including his grandfather, aunt, uncle, pastor, former wrestling coach, ex-girlfriend, and ex-girlfriend's father. Various family members and legal representatives of Getsy's codefendants also testified on Getsy's behalf. In addition to these lay witnesses, Getsy's counsel procured the services of Dr. James Eisenberg, a forensic psychologist, and called him to testify regarding Getsy's mental health.

Getsy must show, in order to demonstrate ineffective assistance, both that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Despite his counsel's extensive mitigation presentation, Getsy points to two alleged deficiencies that he claims gave rise to constitutional violations. He first argues that counsel did not properly investigate his background or help prepare him to give his unsworn statement before the jury. The gist of this argument is that a more thorough investigation and better legal guidance in relation to his unsworn statement to the jury would have permitted

Getsy to "corroborate[]" the testimony presented by other witnesses regarding his fear of Santine and his troubled childhood. He asserts that, with better preparation, he would have been able to present these considerations in a "more sympathetic and compelling manner" than the other witnesses.

The problem with this argument is that nearly all of the mitigating evidence that Getsy now asserts that he would have addressed in his unsworn statement would have been simply cumulative to the evidence actually presented to the jury through numerous other sources. As this court has explained, "the failure to present additional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation." *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). Instead, "in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 318-19 (6th Cir. 2005) (collecting cases and holding that counsel's hiring of a mitigation psychologist the day before the penalty phase began did not result in prejudice, in part because the petitioner could not show how additional time would have resulted in materially different testimony).

Several witnesses, including Getsy's grandfather, aunt, and uncle, attested to Getsy's difficult upbringing and abusive family circumstances. In addition, attorneys and relatives of Getsy's codefendants testified regarding the friendships that existed among the codefendants, their relationship with Santine, and the lesser sentences that they received. Moreover, Getsy himself explained in his unsworn statement to the jury how he believed that his group of friends had come under Santine's influence, how his own fear of Santine developed, and how he had allegedly committed his crimes under duress.

Getsy relies in particular on an affidavit that he submitted during his postconviction proceedings in which he asserted that, with effective assistance, he would have been able to expand upon certain specific topics in his unsworn statement. Close examination reveals, however, that the topics asserted were either already thoroughly addressed by Getsy and the other mitigation witnesses, or simply would have been immaterial. For example, Getsy argues that three "critical events" in his life were never brought to the jury's attention: (1) at the age of five, Getsy saw a window blown out by gunfire in the home of his stepfather, Jim Thrasher, and that Getsy was handed a shotgun during the incident, (2) Getsy had been around guns his entire life and "became obsessed with guns," and (3) he "spent a great deal of time in the woods." But Getsy's aunt in fact testified to the shooting incident at Thrasher's home and to the fact that Getsy's adoptive father, Bill Getsy, was himself "obsessed with guns" and introduced Getsy to guns at a young age.

Moreover, in comparison to other cases granting habeas relief for ineffective assistance of counsel during the penalty phase, the supposed revelations cited by Getsy concerning his background fail to meet the high bar for demonstrating a constitutional violation. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 515-17 (2003) (holding that ineffective assistance occurred where counsel introduced "no evidence of [the defendant's] life history" despite existing evidence of brutal childhood abuse); *Dickerson v. Bagley*, 453 F.3d 690, 698-99 (6th Cir. 2006) (holding that counsel's failure to present mitigation evidence regarding the defendant's borderline mental retardation constituted prejudice).

Getsy's second ineffective-assistance argument addresses his counsel's alleged failure to adequately prepare and present Dr. Eisenberg's expert testimony. Prior to trial, Dr. Eisenberg met with Getsy on five different occasions for a total of 12 to 13 hours. In addition, he reviewed Getsy's school records, the various pieces of evidence used at trial, and conducted interviews with many of Getsy's friends and family members.

In support of his ineffective-assistance argument regarding Dr. Eisenberg's expert testimony, Getsy relies on an affidavit submitted by Dr. Eisenberg in which the latter explained that "I do not believe that I was able to communicate the [mitigatory] information that I possessed to the jury due to the lack of time defense counsel spent with me regarding my testimony." Dr. Eisenberg in particular claims that he "was not able to discuss the issue of obedience to authority" which "helped to explain why the defendants were unable to resist [Santine's] authoritative pronouncement to kill Chuckie Serafino."

A review of Dr. Eisenberg's testimony, however, demonstrates that he extensively discussed the influence that Santine exerted over Getsy and the other codefendants, as well as the duress which he opined drove Getsy to kill. When asked to explain why he believed Getsy committed the crimes at issue, Dr. Eisenberg responded as follows:

> A. . . . I think the inexperience on Jason's part is another factor and something I alluded to in my report is his obedience to authority. I think Jason believed that John Santine had the authority to order this.
> Q. It is your opinion that he was intimidated by Mr. Santine?
> A. Yes.
> . . .
> Q. In what ways is Jason's case different from other death penalty defendants that you have interviewed, sir?
> A. . . . The dynamics of these three boys, all relatively young, certainly not much life experience amongst these three boys, and four if you include Mike Dripps. I think the intimidation factor from John Santine, I don't think I've ever done a death penalty case quite as remarkably intimidating as this, with the exception of some cults that I've worked with.

The relationships among Getsy, Hudach, and McNulty, as well as their relationship with Santine, were, in fact, central themes of Dr. Eisenberg's testimony. Dr. Eisenberg also discussed in detail Getsy's troubled childhood and its effect on his mental state. Moreover, Getsy's counsel introduced Dr. Eisenberg's written report into evidence, which contained an entire section titled "Obedience to Authority" that explained the psychological basis for Getsy's obedience to Santine's authority.

Getsy's conclusory assertions that his trial counsel failed to conduct a reasonable investigation and failed to assist Getsy or Dr. Eisenberg with their testimonial presentations ultimately amount to very little. He cites nothing outside of what the jury already heard in various forms through the 14 mitigation witnesses presented. *See Hill*, 400 F.3d at 318-19. We therefore conclude that the Ohio Supreme Court's denial of Getsy's ineffective-assistance-of-counsel claim was not contrary to or an unreasonable application of clearly established federal law.

**E.     Other issues**

Both the district court and the original panel of this court denied Getsy relief based on his claims that (1) the introduction of his videotaped confession at trial was improper, (2) his jury was not fair and impartial, and (3) he was selectively prosecuted. We agree with the original panel's disposition of these issues and therefore reinstate the portions of the original decision addressing them. *Getsy*, 456 F.3d at 596-98 (addressing those claims in Parts V.A., B., and C.), *vacated*; *see Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 270 (6th Cir. 1998) (reinstating, en banc, a portion of the original panel's decision).

This leaves two remaining issues raised by Getsy before the original panel that it did not reach: (1) his claim that insufficient evidence supported his conviction on the murder-for-hire

aggravating circumstance, and (2) his claim that the cumulative effect of all of the grounds he asserts collectively violated his constitutional rights. We will now address both of those claims. *See Wilson v. Beebe*, 770 F.2d 578, 590 (6th Cir. 1985) (addressing en banc an issue that the parties had raised before the original panel but that the panel had not addressed).

### 1. Sufficiency of the evidence supporting murder for hire

The Ohio Supreme Court concluded that sufficient evidence supported Getsy's conviction on the murder-for-hire aggravating circumstance. Getsy's habeas petition regarding this claim was denied by the district court. Whether Getsy is entitled to habeas relief ultimately depends on whether the Ohio Supreme Court's denial was based on an unreasonable application of clearly established federal law regarding the sufficiency of the evidence. The applicable standard inquires "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

As the Ohio Supreme Court noted, the most compelling evidence that Getsy committed the murder in exchange for compensation comes from Getsy's own confession:

Q. OK. What was discussed there at the house when you come over between you and Ben Hudach?
A. He said that we had something to do, we had to do.
. . .
Q. What did he tell you you had to do?
A. Said we had to take out some guy.
. . .
Q. Was it Ben that was telling you this, or was it John Santine that was telling you this? Be honest now.
A. It was Ben but it came from John.
Q. He said you guys had to take this guy out?
A. Yes.
Q. So basically John was directing this through Ben?
A. Yes, sir.
Q. Were you guys to receive something for doing this?
A. He mentioned money.
Q. Talk up.
A. Mentioned money.
Q. How much money?
A. I really can't remember; it was four (4) digits.
Q. Ten Thousand?
A. No.
Q. Five Thousand?
A. Ten, five, somewhere like that.
. . .
Q. . . . So, you get to the house; Ben starts telling you you guys are going to get paid about $5,000—each, or $5,000 total?
A. I don't know.
Q. OK. To do this guy?
A. Yes.
. . .
Q. Did you get your money?
A. No.
Q. Why not?

A.      'Cause we were going to get it later.  It wasn't for the money, I was doing it because I was scared.

In addition to Getsy's confession, Joshua Koch testified that Santine himself specifically discussed compensation with Getsy and his codefendants after the attack was over:

Q.      Did [Santine] say anything else?
A.      He said how much he was pleased with them and he asked them in the room, "You guys want $10,000, I'll give you $10,000."  Rick said he just wanted a wedding ring for his girlfriend.  John said he would get his girlfriend the biggest f***ing diamond ring in the world.
Q.      Did Ben indicate what he wanted?
A.      Ben jumped forward and said that this was a favor for John Santine, he took care of him.
Q.      Did Jason ever say anything?
A.      He interrupted and made it clear that he was doing it for money.
Q.      And what did he need the money for?
A.      Something about his car, he had something that he had to pay for, maybe payments, maybe insurance.
Q.      So he told John that night that he needed the money to help pay for his car?
A.      Right.

Koch's testimony, combined with Getsy's confession, supports a finding that Santine procured the commission of Serafino's murder in exchange for money, and that Getsy acceded to the arrangement.  Getsy's confession establishes that the offer of money was made prior to and specifically in exchange for the "take out."  Although Getsy asserts that the money played only a small role in the killing, Koch testified to the contrary that Getsy was, in fact, motivated to commit the murder by the offer of money.  *Compare State v. Yarbrough*, 767 N.E.2d 216, 240 (Ohio 2002) (holding that sufficient evidence supported the murder-for-hire conviction of the appellant where a witness both "heard the conversation in which Calvin Davis hired appellant to kill Arnett" and "actually saw McGhee pay his portion in cash") *with State v. Lindsey*, 721 N.E.2d 995, 1001 (Ohio 2000) (noting that the trial court had dismissed the murder-for-hire specification where the state had "failed to present any evidence of compensation").

In response, Getsy contends that "there was substantial evidence demonstrating that Santine threatened and coerced [Getsy and his codefendants] into the shooting of Chuckie Serafino."  But even if true, this observation simply establishes that Getsy may have been motivated by additional concerns beyond remuneration.  A reasonable juror could have decided to credit Koch's testimony that Getsy "made it clear he was doing it for the money."  "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."  *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005).  Similarly, as addressed in Part II.B. above, the fact that a different jury acquitted Santine of the murder-for-hire specification is of no consequence to the question of whether a reasonable juror at Getsy's trial could have determined otherwise beyond a reasonable doubt.  We find no basis to conclude that the Ohio Supreme Court's denial of Getsy's sufficiency-of-the-evidence claim was unreasonable.

### 2.      *Cumulative error*

Getsy's final claim asserts that, even if none of the trial errors he alleges warrants habeas relief individually, their collective effect violated his constitutional rights.  Getsy failed to raise this claim before the state court, but the Warden has not raised the issue of procedural default and has thereby waived it.  *See Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006) (noting that the defense of procedural default may be waived by failing to assert it).  Assuming without deciding that

cumulative error can form the basis for § 2254 habeas relief, Getsy is not entitled to such relief in this case.  The above analysis demonstrates that Getsy has not shown the existence of any constitutional error at trial.  His cumulative-error claim therefore fails because there are simply no errors to cumulate. *See Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004) ("Because Baze cannot establish any errors to cumulate and because his theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is also without merit.").

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

———————

**DISSENT**

———————

MERRITT, Circuit Judge, dissenting. The Ohio state prosecutor, the Ohio Supreme Court, and apparently our Court as well, all concede that the death penalty verdict against Jason Getsy based on a "murder for hire" scheme directly contradicts John Santine's not guilty verdict of the same crime. The crime is indivisible. "Murder for hire" is a conspiracy-type crime requiring a criminal agreement and a confederation between two or more people. Getsy, a teenage boy, was convicted of receiving "murder for hire" money from Santine, and Santine was acquitted of paying the "murder for hire" money to Getsy. Thus the two verdicts are inconsistent and irrational, and the verdict against Getsy should not be allowed to result in his execution.

The Ohio Supreme Court said clearly that the "predominant" reason for imposing the death penalty on Getsy in this case "is the murder-for-hire specification," 702 N.E.2d 866 at 892, but then observed that the death sentence in the case is "troubling" because John Santine, the only alleged "hirer" and the instigator of the murder, was acquitted of murder for hire: "If not for John Santine, it is unlikely the Serafinos would have been shot." *Id.* In the severed state trial seeking the death penalty against Santine based on the "murder for hire" theory — the trial that led to the Ohio Supreme Court opinion — the state prosecutor repeatedly emphasized to the jury that Santine was by far the most blameworthy defendant. The prosecutor said then (contrary to his present position) that Santine "could control" Getsy because Santine was "about a decade and a half older" than Getsy, who was 19 years old. (App. 7361) Getsy was an inexperienced, uneducated boy and "could be easily led, sort of a semi-military lifestyle." *Id.* The prosecutor told the jurors that Santine "enticed" Getsy "into his web," "provided marijuana," "talked big," "provided the motive," and "was the only person here with a motive for the killing." *Id.* Throughout the case the prosecutor repeated this theory of the case, comparing the relative culpability of the Getsy boy and Santine. Acquitting Santine, the jury rejected the State's theory that Getsy and Santine formed a criminal agreement of murder for hire — the "predominant" aggravator, as acknowledged by the Ohio courts.

Getsy's irrational, inconsistent death verdict should be set aside based on a clear, long-standing common law principle — a principle adopted by the Supreme Court as a matter of due process long ago, *Morrison v. California*, 291 U.S. 82 (1934), as explained below. As outlined in Section I below, in 1791 and for the two preceding centuries, the English Common Law followed the rule that inconsistent verdicts of guilt based on an alleged criminal agreement or conspiracy must be quashed. In addition, as explained in Section II, literally and textually speaking, the state killing of Getsy in contrast to the treatment of Santine is so grossly disproportionate and unequal as to be both "cruel and unusual" and, therefore, the type of "punishment" expressly forbidden by the Eighth Amendment.

In many cases decided over the last two centuries, the Supreme Court and the lower federal courts have found that English common law rules and principles in existence when the Founders wrote the Constitution serve as valuable tools in defining the meaning of the liberties established in the Bill of Rights, such as those requiring due process of law, forbidding cruel and unusual punishment, establishing the right to a jury trial, guaranteeing cross-examination of witnesses and other civil liberties. We learn of that long tradition of Anglo-American common law adjudication and how it influences our constitutional rights in the first year of law school. *See*, *e.g.*, *Morrison v. California*, 291 U.S. 82 (1934) (adopting under the Due Process Clause the common law rule requiring at least two conspirators to uphold a verdict based on the formation of a criminal agreement, as discussed below); *Deck v. Missouri*, 544 U.S. 622, 631-32 (2005) (holding that Eighth Amendment normally prohibits shackling a capital defendant at trial and sentencing, citing early English common law cases); *id.* at 637-38 (Thomas, J., dissenting) (recognizing the same rule based

on Blackstone and Coke's treatises); *United States v. Booker*, 543 U.S. 220 (2005) (following common law requirements for trial by jury in criminal sentencing); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (basing the meaning of Confrontational Clause concerning cross-examination on Blackstone and case law from English courts and American colonies). See the recent scholarly discussion of the use of English common law in constitutional interpretation, Meyler, *Towards a Common Law Originalism* 59 Stan. L. Rev 551 (Dec. 2006).

### I.  The Invalidity of Inconsistent Verdicts in Prosecutions Based on A Criminal Agreement

Since 1599 during the reign of Queen Elizabeth I, when Sir Edward Coke was Attorney General and the young philosopher-scientist, Sir Francis Bacon, was Queen's Counsel, the rule of Anglo-American law has been that "one cannot conspire alone," or alone commit a contract crime like murder for hire. This exact language was first enunciated in *Marsh v. Vaughn*, 78 Eng. Rep. 937 (Q.B. 1599). The opinion of the Queen's Bench states as follows:

> The defendants pleaded not guilty, and the one was found guilty and the other not. And it was hereupon moved, that the bill should abate; for it ought to be against two, *and the one cannot conspire alone; and the one being acquitted, the other sole cannot be attainted.*

*Id.* (Emphasis added.) This is no judicial aberration. This is the way English law has dealt with such disproportionate punishment. This rule has been consistently followed in English law from that day to this. *See*, *e.g.*, *Harison v. Errington*, 79 Eng. Rep. 1292 (K.B. 1627) (riot); *Rex v. Grimes*, 87 Eng. Rep. 142 (K.B. 1688) (two were charged with "*confederationem*" and "though one was acquitted, yet the jury had found the other guilty" requiring the court to quash the guilty verdict); *Rex v. Kinnersley*, 93 Eng. Rep. 467 (K.B. 1719) (same); *Queen v. Thompson*, 117 Eng. Rep. 1100 (Q.B. 1851) (same); *Rex v. Plummer*, 2 K.B. 339, 345 (1902) (court invalidated a conspiracy conviction after a guilty plea when the defendant's two alleged co-conspirators were acquitted). *See also* IV *Blackstone's Commentaries on the Laws of England*, ch. 10, ¶ 15, p. 136 (1765) (Legal Classics Library 1983) (requiring conviction of two to constitute a criminal agreement "for there must be at least two to form a conspiracy"). This ancient rule of consistency and proportionality in punishment was legislatively enacted by Parliament in 1977, Criminal Law Act, 1977, ch. 45 § 5(8), which provides that when other persons charged with a criminal agreement "have been acquitted of conspiracy by reference to that agreement (whether after being tried with the person convicted or separately) the conviction shall be quashed if under all the circumstances of the case his conviction is inconsistent with the acquittal of the other." For more than four centuries, from 1599 until the present day, that has been the law. Since the time of Lord Coke, the English courts under this doctrine would never have let Getsy's conviction of murder for hire stand.

In a supreme instance of legal legerdemain, the majority opinion in this case tries to spin the opinion of the Supreme Court in *United States v. Powell*, 469 U.S. 57 (1984), into a rejection of this ancient rule and the rule's insistence on a measure of rationality, consistency and proportionality in punishment. That reliance is completely specious because *Powell* is not a multi-defendant case in which a defendant's conviction of a criminal agreement with another stands as the jury acquits his only alleged co-conspirator. *Powell* was simply a single defendant situation in which the jury convictions on separate counts were inconsistent under one reading of the charges made in the separate counts. There the Supreme Court, relying on language from an earlier opinion by Justice Holmes, held that the separate counts provided rough equity or fairness in holding that the *Powell* defendant must take the bad count with the good counts. *See* 469 U.S. at 62 (quoting and agreeing with Justice Holmes in *Dunn v. United States*, 284 U.S. 390, 393 (1932), in which Holmes relied on an English case from the Queen's Bench, *Latham v. The Queen*, 122 Eng. Rep. 968 (Q.B. 1864), for

the proposition that "each Count in an indictment is regarded as if it was a separate indictment").

It is impossible to legitimately rely on *Powell* and *Dunn* here because two terms later in *Morrison v. California*, 291 U.S. 82 (1934), the Supreme Court in a unanimous opinion by Justice Cardozo, followed the ancient English rule that an inconsistent verdict of conviction in a multiple defendant case based on a criminal agreement must be quashed as a matter of due process. In that case the Court found in a state criminal case that the California Supreme Court erred *in violation of the Due Process Clause* in upholding a conspiracy verdict against one party to an illegal contract for the sale of land when the other party lacked the requisite element of intent and was, therefore, acquitted. Justice Cardozo explained:

> It is impossible in the nature of things for man to conspire with himself. *Turinetti v. United States*, 2 F. (2d) 15, 17. In California as elsewhere conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each. *People v. Richards*, 67 Cal. 412; 7 Pac. 828; *People v. Kizer*, 22 Cal. App. 10, 14; 133 Pac. 516, 521; 134 *id*. 346; *People v. Entriken*, 106 Cal. App. 29, 32; 288 Pac. 788; *DSands v. Commonwealth*, 21 Gratt. (Va.) 871, 899; *Pettibone v. United States*, 148 U.S. 197, 203, 205. . . . In such circumstances the conviction of Morrison because he failed to assume the burden of disproving a conspiracy was a denial of due process that vitiates the judgment as to him. Nor is that the only consequence. . . . . *The conviction failing as to the one defendant must fail as to the other*. *Turinetti v. United States*, *supra*; *Williams v. United States*, 282 Fed. 481, 484; *Gebardi v. United States*, *supra*.

291 U.S. at 92-93 (emphasis added). Under the Due Process Clause of the Fourteenth Amendment, the Supreme Court reversed the conspiracy conviction and followed the English rule in existence when our Constitution was framed. The Court has never questioned the validity of its unanimous due process holding in *Morrison*. It has never retracted or narrowed the constitutional holding quoted above derived directly from the ancient English rule. *See*, *e.g.*, *Hartzel v. United States*, 322 U.S. 680, 682 n. 3 (1944) (the Court described two other defendants as "the only co-conspirators of petitioner named in the indictment and the setting aside of their convictions makes it impossible to sustain petitioner's conviction upon the basis of count 7 of the conspiracy count"). In *Powell*, relied on in error by the majority, the Supreme Court does not even mention *Morrison* or the traditional rule — obviously considering it unrelated to *Powell's* single-defendant, separate count inconsistency, just as the English courts considered the two rules completely unrelated, as Justice Holmes recognized in his opinion in *Dunn*. *Powell* is, therefore, entirely irrelevant to the problem before us and cannot be legitimately spun as a justification by the majority in favor of upholding Getsy's execution.

It is equally misguided for the majority to say that a clear, unanimous constitutional holding in 1934 in *Morrison*, never overruled or questioned since, does not meet the standard of "clearly established law" found in AEDPA. If a clear rule of law four centuries old, adopted as a matter of Due Process 70 years ago by the Supreme Court, will not meet the AEDPA test, nothing will.

In response to this dissenting opinion, the majority has attempted to distinguish the *Morrison* case. It says that *Morrison* does not apply because (a) one of the two alleged co-conspirators, Santine, was acquitted by a jury rather than by a court, and because (b) the inconsistent punishment in this case was imposed "by different juries in separate trials" instead of in a joint trial. The majority would create a brand new "ancient" rule that is incompatible with the original common law rule and with the *Morrison* case. They gut the ancient rule of consistent and proportional punishment adopted in *Morrison* by limiting it to situations where only a judge rather than a jury has acquitted one of the two alleged co-conspirators, and then only after a joint trial. These two

exceptions were explicitly rejected by the English common law and by Parliament, as the cases and parliamentary action discussed above clearly demonstrate. The majority refuses to acknowledge that the English common law rule adopted in *Morrison* applies to jury acquittals in separate trials.

Justice Cardozo's unanimous opinion in *Morrison* states the rule it adopts using the same language as the English courts: "It is impossible in the nature of things for a man to conspire with himself . . . . The conviction failing as to one defendant must fail as to the other." 291 U.S. at 93. This language states a general rule and leaves no room for the majority's two exceptions. The *Morrison* rule does not turn on fortuitous circumstances like whether the trial judge granted a severance and tried the defendant separately, or granted a motion for acquittal rather than letting the case go to the jury. In the present case, Getsy and Santine were indicted jointly but severed for trial. The majority makes the question of life or death in this case turn on the granting of a severance. My colleagues in the majority refuse to carry out the basic purpose of the rule: the elimination of inconsistent and disproportionate punishment among alleged co-conspirators.

In addition, and equally important, the effect of the majority's exception for separate trials is to make *Morrison* and the ancient rule completely inapplicable to all modern death penalty cases. The states that continue to use the death penalty bifurcate such trials by conducting a guilt phase trial and then a second trial for imposing the punishment. *E.g.*, Ohio Rev. Code § 2929.03 (describing trial jury's role in determining the sentence for a capital defendant). As a result, trial judges in capital cases now grant a severance and try defendants separately rather than jointly. The bifurcation of all capital trials, together with extensive *voir dire* of jurors and the present requirements for jury findings of individual aggravating circumstances, makes the conduct of multi-defendant capital trials too complex. Therefore, the current practice in capital cases is to grant a severance and try defendants separately, as in the case of Getsy and Santine. The majority's exceptions mean that the ancient rule of consistency and proportionality of punishment no longer applies in death penalty cases because such trials are not conducted as joint trials.

The ancient rule was adopted and applied when there were almost 200 crimes in addition to murder carrying the death penalty — robbery, larceny, burglary, rape, assault, treason, sedition, blasphemy, sodomy, and many others. The ancient rule was designed to eliminate some of the harshness and arbitrariness of the death penalty by introducing a common sense rule of consistency and proportionality among the participants in the same criminal episode. It is ironic, indeed, that the majority has now eliminated the rule in capital cases. What was true for four centuries in such cases — "it is impossible in the nature of things for a man to conspire with himself" — is no longer true. The majority is willing to destroy the ancient rule, but the judges are unable to cite a single capital case supporting their position from the entire history of Anglo-American law. No such case has ever suggested, much less applied, the majority's exceptions. The *Morrison* rule has existed for four centuries only to be effectively overruled today in capital cases by the majority of this Court.

## II. Post-*Furman* Death Penalty Jurisprudence Also Outlaws Getsy Death Sentence

Modern post-*Furman* Eighth Amendment proportionality analysis dramatically reinforces the ancient rule's policy against unequal or disproportionate punishments in connection with the same criminal event. The post-*Furman* line of Eighth Amendment death penalty cases based on "evolving standards of decency that mark the progress of a maturing society"[1] emphasize the need

---

[1]*Trop v. Dulles*, 356 U.S. 86, 100-01 (1958):

The phrase in our Constitution ["cruel and unusual punishment"] was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta.

to eliminate the kind of grossly disproportionate, arbitrary death sentences found in this case. As I will explain below, the Supreme Court's *Enmund* Eighth Amendment proportionality case reinforces the Supreme Court's adoption of the ancient rule in the *Morrison* due process case. The modern, post-*Furman* mode of death penalty analysis — based on the more humane set of "evolving standards of decency" that now limit the death penalty — reinforces the ancient rule's natural law requirements of rationality and symmetry. Therefore, the more formalist, "originalist" judge and the more pragmatic, "living-constitution" judge should be able to agree on the outcome of this case. But my brothers and sisters in the majority are unable to open their minds to a consideration of either mode of analysis.

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court, in a one paragraph per curiam opinion, held that the death penalty was unconstitutionally cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Id.* at 239-40. The concurring opinions that followed explained that the death penalty was being imposed so discriminatorily, *id.* at 240 (Douglas, J., concurring), and so wantonly and freakishly, *id.* at 306 (Stewart, J., concurring), that any given death sentence was unconstitutionally "cruel and unusual." Indeed, the death sentences examined by the Supreme Court in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death ha[d] in fact been imposed." *Id.* at 309-10 (Stewart, J., concurring). Thus, *Furman* established that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this penalty to be arbitrarily, capriciously and inconsistently imposed. *Id.* at 310; *Spaziano v. Florida*, 468 U.S. 447, 460 (1984) (*Furman* established that "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (*Furman* established that "if a State wishes to authorize capital punishment it has a constitutional responsibility to . . . apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.").

It is now also well settled that the penalty of death is different in kind from any other punishment imposed under our system of justice. "From the point of view of the defendant, it is different both in its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The qualitative difference of death from all other punishments requires a correspondingly greater need for reliability, consistency, and fairness in capital sentencing decisions. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. *Gardner*, 430 U.S. at 357. Accordingly, the courts must "carefully scrutinize" sentencing decisions "to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Spaziano*, 468 U.S. at 460 n.7. The death-is-different principle can only be observed here by holding that the inconsistent and disproportionate sentences in the same case violate the clearly established *Furman* arbitrariness principle and hence the Eighth Amendment.

In evaluating whether a death sentence is arbitrary, the Supreme Court has directed courts to evaluate a defendant's culpability both individually and in terms of the sentences of codefendants

---

The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . . *Weems v. United States*, 217 U.S. 349. The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

and accomplices *in the same case*. *Enmund v. Florida*, 458 U.S. 782, 788, 798 (1982). In *Enmund*, the Supreme Court found a violation of the Eighth Amendment when defendants with "plainly different" culpability received the same capital sentence. The Court required proportionality comparison with others participating in the same crime:

> Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.

*Id.* at 798.

The instant case presents the situation where the defendant with the lesser culpability received the harsher sentence — the death penalty. Numerous state courts have applied the *Enmund* principle to require reasonable symmetry between culpability and the sentencing of codefendants. *See*, *e.g.*, *People v. Kliner*, 705 N.E.2d 850, 897 (Ill. 1998) ("[S]imilarly situated codefendants should not be given arbitrarily or unreasonably disparate sentences."); *Larzelere v. State*, 676 So. 2d 394, 406 (Fla. 1996) ("When a codefendant . . . is equally as culpable or more culpable than the defendant, disparate treatment of the codefendant may render the defendant's punishment disproportionate."); *Hall v. State*, 244 S.E.2d 833, 839 (Ga. 1978) ("We find that . . . the death sentence, imposed on Hall for the same crime in which the co-defendant triggerman received a life sentence, is disproportionate."). Similarly, the Federal Death Penalty Act recognizes that a comparison of the sentences received by codefendants is required. *See* 18 U.S.C. § 3592(a)(4) (listing as a mitigating factor the lack of death sentences for equally or more culpable codefendants).

The principle requiring rational, *proportionate punishment* is the essence of the rule of law. It has deep roots in our cultural and biological heritage. Aristotle observed in the *Nicomachean Ethics* that basic notions of justice require treating like cases alike:

> If, then, the unjust is unequal, the just is equal, as all men suppose it to be, even apart from argument. . . . This, then, is what the just is — the proportional; the unjust is what violates the proportion. . . . [I]t is by proportionate requital that the city holds together.

Aristotle, *Ethica Nichomachea, in The Works of Aristotle* V.3.1131a-1131b, V.5.1132b (W.D. Ross ed. & trans. 1954). In a recent article, Judge Morris Hoffman and Timothy Goldsmith, a distinguished Yale biologist, make this point:

> [I]t is not surprising that collectively we struggle to balance the form and amount of punishment that is appropriate, a struggle that lies at the heart of what we mean by "justice." . . . .
>
> The two faces of justice — to deal firmly with transgressors, but not too harshly — reflect an intrinsic human sense of fairness and are important to the political ideal of equality. When Aristotle commands that like cases be treated alike, he is touching both on the personal notion that none of us wants to be punished more than anyone else (and therefore on our self-interest) and on the social notion that none of us wants to punish others more than they deserve (and therefore on the equilibrium between our inclination to punish and our intuitions about fairness and sympathy).

Morris B. Hoffman & Timothy H. Goldsmith, *The Biological Roots of Punishment*, 1 Ohio St. J. Crim. L. 627, 638-39 (2004).

In another instance of obfuscation, the majority argues that the Supreme Court's decision in *Pulley v. Harris*, 465 U.S. 37 (1984), precludes our consideration of the "comparative proportionality" of sentences in this case. *Pulley's* holding has nothing to do with this case. *Pulley* simply held that the Eighth Amendment does not require a state supreme court to systematically review the comparative proportionality of sentences in other cases unrelated to the case at hand. *Id.* at 50-51. *Pulley* concerned whether the Eighth Amendment mandates in every case a proportionality review of a particular death sentence in comparison with the punishment imposed on others for the same general type of crime in unrelated cases. Our holding neither contradicts this rule nor requires systematic comparative proportionality review of unrelated cases. Instead, we simply adhere to the clearly established, common sense principle of *Enmund* that, in a capital case with respect to the *very same* crime stemming from the *very same* facts, the Eighth Amendment does not permit the codefendant with less culpability to receive the death penalty when the codefendant with greater culpability receives a lesser sentence. The majority's view is in conflict with the holding of *Enmund* and allows the less culpable participant in the same criminal episode to receive the death penalty when the more culpable participant receives the lesser sentence.

Thus both the ancient rule invalidating inconsistent conspiracy verdicts and the modern rule directly phrased in terms of consistency, rationality and proportionality require the conclusion that Getsy's death verdict should be set aside.

———————————

**DISSENT**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting, joined by Judge Merritt. I join Judge Merritt's cogent dissent. I write separately only to highlight how this case brings into stark relief why the death penalty in this country is "arbitrary, biased, and so fundamentally flawed at its very core that it is beyond repair." *Moore v. Parker*, 425 F.3d 250, 268 (6th Cir. 2005) (Martin, J., dissenting).

In *Moore*, the majority and I disagreed as to whether the performance of Moore's trial counsel was unconstitutionally defective, and whether this performance—or lack thereof—unconstitutionally prejudiced the outcome of his trial. My generalized thoughts about the arbitrary imposition of the death penalty were predicated on the notion that a defendant's life or death should not hinge on the proficiency of his attorney, especially when most states' compensation schemes for appointed counsel provide precious little incentive for good lawyering. *Id.* at 270 ("[O]ne of the most clear examples of the arbitrariness of the death penalty is the common knowledge that those defendants with decent lawyers rarely get sentenced to death.").

In a subsequent death penalty case, *Benge v. Johnson*, I parted ways with the majority because "the only legal hook on which Benge's death sentence hangs is the jury's finding that he also committed aggravated robbery by stealing Gabbard's ATM card in the process of killing her." 474 F.3d 236, 254 (6th Cir. 2007) (Martin, J., dissenting). I then considered the hypothetical other acts that Benge could have committed and yet escaped death under state law:

> Had Benge impulsively and fatally hit his common law wife in the head with a tire iron in an abhorrent act of extreme domestic violence, instead of killing her to gain access to her ATM card, as the prosecution alleged and the jury supposedly found, would his conduct somehow be less heinous and reprehensible? Such a murder would be at least as revolting as the one that occurred here, yet as far as I can tell, would have presented none of the aggravating factors required for a death sentence under Ohio law.

*Id.*

In Jason Getsy's case, sadly, we need not consider hypotheticals, such as the better-paid lawyer who would likely have done a better job, or the brutal murder which, for whatever reasons, could not be coupled with any of a state's statutory aggravating circumstances. For in Getsy's case the hypothetical is made real. The nineteen-year-old Getsy was sentenced to death for being one of the trigger men in a murder-for-hire conspiracy. His two compatriots, Richard McNulty and Ben Hudach, did not receive the death penalty because both were offered and accepted plea bargains. Thus there is some logic, perhaps, to why McNulty and Hudach received lesser sentences. But there is no logic to why John Santine, the mastermind of the conspiracy, who paid Getsy, McNulty, and Hudach to do his dirty work, and who took great steps to make sure they completed the job, also did not receive a death sentence. As the Supreme Court of Ohio noted despite upholding Getsy's death sentence:

> It is clear that Getsy would not have committed these crimes if he had never met Santine . . . .

> It was clear from the videotape of his statement that Getsy feared Santine and was afraid that Santine would execute him. Getsy apparently was afraid to go to the

police because Santine made it appear that he had the police in his pocket. This belief was supported by the fact that McNulty told police what Santine was planning and the police did nothing . . . .

When the group first went to the Serafino house, they returned to the apartment without completing the act, using the excuse that they could not find a place to park. Santine became furious, eventually driving Getsy, McNulty, and Hudach back to the place himself . . . .

It is . . . troubling that Santine did not receive the death sentence even though he initiated the crime.

*State v. Getsy*, 702 N.E.2d 866, 890-92 (Ohio 1998).

The majority argues that no Supreme Court, Sixth Circuit, or Ohio state precedents demand that the proportionality principle include in its calculus other defendants who have *not* been sentenced to death (such as Santine in this case). I side with Judge Merritt in rejecting this proposition. Yet even if the majority were correct, that only bolsters my concerns, for the majority's rule effectively blesses an arbitrary scheme: that an Ohio state court must weigh the proportionality of an individual's death sentence against others who have received the death sentence, but that the same state court need not weigh the proportionality of an individual's death sentence against that of a *co-conspirator* who did not receive death.

The majority adds that the Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984), and the gloss put on *Powell* in *United States v. Crayton*, 357 F.3d 560 (6th Cir. 2004), have sounded the death-knell of the common-law "rule of consistency." Once again, however, even if the majority were correct on this score, it places itself in a serious pickle. For if *Powell* and *Crayton* do not require that the rule of consistency be brought to bear on a case such as Getsy's, then this court's application of the death penalty is *a fortiori inconsistent*. This state of affairs I find unconscionable, even as I remain bound to apply the laws of this court and of the Supreme Court. *Cf. Benge*, 474 F.3d at 258; *Moore*, 425 F.3d at 270. "[It] is not justice. It is caprice." *Abdul-Kabir v. Quarterman*, — U.S. — , 127 S. Ct. 1654, 1686 (2007) (Scalia, J., dissenting).

Jason Getsy and John Santine are not hypothetical players in a criminal law final exam. They are real people who committed real crimes, indeed, the *same* crimes. That Getsy will be put to death while Santine will be spared, and that the law (at least according to the majority) actually sanctions this result, makes it virtually impossible for me to answer in the affirmative what Justice Blackmun viewed as the fundamental question in *Callins v. Collins*, 510 U.S. 1141, 1145 (1984) — namely, does our system of capital punishment "accurately and consistently determine" which defendants "deserve" to die and which do not?

————————————

## DISSENT

————————————

KAREN NELSON MOORE, Circuit Judge, dissenting. I join Judge Merritt's excellent opinion in full, and I write separately to address Getsy's judicial bias claim. I believe that *Bracy v. Gramley*, 520 U.S. 899 (1997), has far more bearing on the case before us than the majority lets on.

In *Bracy*, the Supreme Court concluded that the district court abused its discretion by refusing to permit Bracy to undertake discovery. *Id.* at 909. Evidence came to light that Bracy's trial judge had accepted bribes, and although there was no evidence that the trial judge accepted a bribe in Bracy's case, Bracy alleged that his lawyer, a former associate of the trial judge, agreed not to object or otherwise interfere with a prompt trial so that Bracy's case could proceed quickly and camouflage bribe negotiations for a case to be tried later. *Id.* at 907-08. The Court acknowledged that "[i]t may well be . . . that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case," but concluded that the specificity of Bracy's allegations combined with the circumstantial evidence linking Bracy's lawyer to the corrupt trial judge was sufficient to warrant discovery. *Id.* at 908-09.

Similarly, in this case, Getsy has specific evidence of circumstances raising the possibility of bias—specifically, evidence that Judge McKay socialized with Prosecutor Rice during the trial and that Judge McKay was charged for drunk driving, raising the possibility that Judge McKay curried favor with the prosecutor's office in order to garner favorable treatment during his criminal prosecution, *cf. Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir. 1992) (noting that a defense lawyer may act out of self-interest rather than in the defendant's interest when the lawyer is under criminal investigation), or because of his relationship with Prosecutor Rice, who might be both a close friend and a potential witness in the judge's criminal case. Indeed, Judge McKay took the bench the day after his arrest without informing the defense of what had happened, raising the likelihood of further impropriety well above the speculative level. Just as in *Bracy*, Getsy has not been able to prove how these improprieties prejudiced him directly, but has made specific allegations that can only be proven or disproven with further evidentiary development, and I would conclude that, just as in *Bracy*, the district court's decision to deny Getsy an opportunity for further evidentiary development was an abuse of discretion.

The majority makes much of evidence that Judge McKay was prosecuted by a special prosecutor from another county, but this evidence does not show when the special prosecutor took over the case and under what circumstances, actually highlighting the need for further evidentiary development. The state courts denied this opportunity to Getsy at every turn, and I respectfully dissent from the majority's decision to deny him this opportunity yet again.